UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAR CORPORATION,

     Plaintiff,

v.

NHK SEATING OF AMERICA INC.,
NHK SPRING COMPANY, LIMITED,
and
NHK INTERNATIONAL INC.,

     Defendants.

Case No. 13-12937
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING IN PART LEAR'S MOTION FOR SUMMARY JUDGMENT OF NON-TECHNOLOGY ISSUES [237]

Lear Corporation holds a series of patents on active-headrest-restraint technology. The patented technology reduces whiplash during a vehicle crash by moving the headrest to minimize the impact. Lear believes that NHK Seating of America, NHK Spring Company, and NHK International ("the NHK Companies") have made or sold products that infringe some of its active-headrest-restraint patents. So Lear filed this patent-infringement lawsuit against, initially, NHK Seating of America and, later, NHK Spring Company and NHK International.

This nine-year-old case has finally reached the summary-judgment stage. Both sides seek summary judgment on various claims or defenses. This opinion addresses Lear's summary-judgment motion that is not based on the structure or operation of the patented inventions, i.e., Lear's "non-technology" motion for summary judgment.

In its non-technology motion, Lear argues that many of the NHK Companies' affirmative defenses fail as a matter of law.

Summary judgment is warranted in part. As detailed below, the Court agrees with Lear that clear and convincing evidence does not support the NHK Companies' on-sale-bar defense to U.S. Patent No. 7,455,357 or their inequitable-conduct defenses to U.S. Patent Nos. 6,631,949, 6,655,733, and 7,455,357. But Lear has not shown that it is entitled to summary judgment on the NHK Companies' defenses based on the written-description, enablement, and definiteness requirements for patents. Thus, Lear's motion will be granted in part and denied in part.

## I. Background

A brief summary on the patents-in-suit and the procedural history of this case provides helpful context for Lear's non-technology motion for summary judgment.

## A. Patents-in-Suit

As this case now stands, Lear asserts that the NHK Companies have infringed claims of five patents: U.S. Patent Nos. 5,378,043, 6,631,949, 6,655,733, 7,455,357, and 8,434,818. (*See* ECF No. 237, PageID.11214.) (The initial complaint alleged infringement of additional patents. (*See* ECF No. 1, PageID.1–5.)) All five of these patents cover inventions in the field of active-headrest-restraints. Generally speaking, when a driver's back is forced against the seatback during a car crash, the patented inventions transfer that force to move the headrest of the seat forward. This, in turn, reduces or prevents whiplash.

A patent application for the earliest of the five patents-in-suit, the '043 patent, was filed almost 30 years ago. U.S. Patent No. 5,378,043, at [22] (filed Jun. 1, 1993). The claimed invention functioned like a seesaw. In particular, when the driver's back is forced against the seatback during a collision, the headrest rotates in the opposite direction around an axis toward the driver, like a see-saw. Below is a figure from the '043 patent showing this see-saw-like functionality:



U.S. Patent No. 5,378,043 fig. 3 (filed Jun. 1, 1993).

Lear's active-headrest-restraint system evolved over time, with the '357 patent representing one of the advancements. On October 4, 2006 (a date that will be important later), Lear filed a patent application for what would eventually mature into the '357 patent. The claimed invention of the '357 patent involves a four-bar mechanism. '357 Patent, col. 6, ll. 1–2. Unlike the see-saw design, the four-bar mechanism transfers force from the lumbar region of the seatback up to the headrest using a system of four linkages. *See id.*

3

## B. Procedural History

This nine-year-old case, of course, has an extensive procedural history; the Court highlights some of the key events between 2013 and 2021. Lear filed this patent-infringement lawsuit against NHK Seating of America in September 2013. (ECF No. 1.) Because of proceedings before the Patent Trial and Appeal Board, this case was stayed until early 2017. (ECF No. 30, 35.) In early 2018, the parties filed their claim-construction motions, and in mid-2018, this Court adopted the constructions of then Special Master James F. Davis. (ECF Nos. 77, 81, 90, 96.) In 2019, the parties agreed to consolidate this case with a case that Lear filed against NHK Spring Company and NHK International. (ECF No. 140.) Shortly after the cases were consolidated, the Court adopted then Special Master Davis' recommendation to deny NHK Seating of America's motion for summary judgment on issues of infringement. (ECF Nos. 136, 144.) After multiple extensions of the deadline, fact discovery closed in May 2021. (*See* ECF No. 211.)

Beginning in August 2021, the parties filed a slew of motions. And some were outsized. Lear initially sought to file an 85-page summary-judgment brief that, in its view, would "dispense with a majority of the 40+ invalidity and inequitable conduct issues asserted by NHK." (ECF No. 221, PageID.7279.) For their part, the NHK Companies sought to file a 45-page summary-judgment brief despite that they, collectively, had filed two prior motions for summary judgment. (ECF No. 194, PageID.6897.) The Court ended up directing Lear to split its summary-judgment motion into two—a 40-page motion that made arguments based on the technology of

4

the patents-in-suit and a 30-page motion that made arguments not based on the underlying technology. The Court also granted the NHK Companies leave to file a 30-page summary-judgment motion (which, due to a motion to file a sur-reply and an associated motion to amend the complaint, effectively exceeded the originally requested 45 pages). Several other motions also remain pending.

This opinion addresses only Lear's non-technology motion. (Lear's technology motion has been referred to Special Master Joseph W. Berenato, III. (ECF No. 267.)) Lear's non-technology motion seeks to eliminate some of the NHK Companies' affirmative defenses before trial. It proceeds in three parts. In one part, Lear argues that the NHK Companies lack sufficient evidence supporting defenses based on the written-description requirement, non-enablement, and indefiniteness (among others). (ECF No. 237, PageID.11221–11223.) In a second part, Lear argues that the NHK Companies lack sufficient evidence supporting their claim that the '357 patent is invalid because the claimed invention was on sale more than one year before that patent application was filed. (*Id.* at PageID.11224–11230.) In a third part of its motion, Lear argues that the NHK Companies lack sufficient evidence supporting their claim that the '043, '733, '949, and '357 patents are unenforceable because Lear engaged in inequitable conduct when prosecuting those patents. (*Id.* at PageID.11230–11241.) Although the NHK Companies have agreed to drop a few affirmative defenses in response to Lear's motion, for the most part, they oppose Lear's motion. (*See* ECF No. 250.)

## II. Decisional Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. Analysis

Like Lear's motion, the Court's analysis is divided into three parts. The Court first addresses the viability of the NHK Companies' claim that the '357 patent is invalid due to the on-sale bar. The Court then addresses the viability of the NHK Companies' claim that the '043, '733, '949, and '357 patents are unenforceable due to Lear's inequitable conduct. Finally, the Court addresses Lear's arguments that the NHK Companies' lack sufficient evidence supporting their defenses based on the written-description requirement, non-enablement, and indefiniteness.

## A. On-Sale Bar

The "on-sale bar" is shorthand for a provision of 35 U.S.C. § 102(b). In particular, if an invention "was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States," then the invention is not entitled to patent protection. *See* 35 U.S.C. § 102(b) (pre-AIA). To satisfy the term "on sale" as used in § 102(b), the NHK Companies must show that Lear made a "commercial offer" to sell the invention claimed in the '357 patent. *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). If by "simple acceptance" the offer becomes a binding contract, then the offer is a commercial offer for sale. *Junker v. Med. Components, Inc.*, — F.4th —, No. 2021-1649, 2022 WL 402132, at *3 (Fed. Cir. Feb. 10, 2022) (internal quotation marks omitted); *see also Medicines Co. v. Hospira, Inc.*,

6

827 F.3d 1363, 1373 (Fed. Cir. 2016) (en banc) ("[A]s a general proposition, we will look to the Uniform Commercial Code ('UCC') to define whether . . . a communication or series of communications rises to the level of a commercial offer for sale.").

The NHK Companies argue that Lear made two commercial offers of the invention of the '357 patent more than one year before Lear filed the application for the '357 patent. (*See* ECF No. 250, PageID.14019–14029.) To break that down a bit, Lear filed an application for the '357 patent on October 4, 2006, making the critical date for the on-sale bar one year earlier, October 4, 2005. *See* 35 U.S.C. § 102(b) (pre-AIA). According to the NHK Companies, Lear's Protec Plus product embodied the claimed invention of the '357 patent prior to October 4, 2005. (The precise spelling is "ProTec PLuS" representing "Pelvis Lumbar Shoulder" (ECF No. 257-26, PageID.15620), but the Court elects the easier-on-the-eyes "Protec Plus.") The NHK Companies say that in 2004, Lear offered the Protec Plus to Toyota and that in 2005, Lear offered the Protec Plus to Honda or a Honda supplier, Tachi-S. (ECF No. 250, PageID.14023, 14026.) Thus, according to the NHK Companies, Lear made two commercial offers for the invention of the '357 patent before October 4, 2005, either of which invalidates the patent.

Lear disagrees. According to Lear, it made no commercial offer of the Protec Plus to Toyota, Honda, or Tachi-S before the October 4, 2005 critical date. And, says Lear, the evidence puts the issue beyond reasonable debate, and so it is entitled to summary judgment. (*See* ECF No. 237, PageID.11224–11230.)

7

## 1. Summary-Judgment Framework for On-Sale Defense

Before examining the two alleged sales, it is helpful to put the framework for resolving this portion of Lear's summary-judgment motion firmly in place.

Two parts of the framework are straightforward. Because Lear has moved for summary judgment, the evidence must be viewed in the light most favorable to the NHK Companies and justifiable inferences must be drawn in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And because patents are presumptively valid, at trial the NHK Companies would have the burden of showing that the on-sale bar renders the '357 patent invalid by clear and convincing evidence. *See Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 300 F. App'x 904, 906 (Fed. Cir. 2008); *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1358 (Fed. Cir. 2006).

The third part of the framework is a bit more complicated, and, unfortunately, neither party has addressed it. When deciding a motion for summary judgment, a court typically asks whether a reasonable jury could find for the party that bears the burden of proof on the issue at trial. But "[w]hether an invention was on sale within the meaning of § 102(b) is a question of law based upon underlying facts." *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.*, 417 F.3d 1203, 1209 (Fed. Cir. 2005); *accord Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1308 (Fed. Cir. 2004). So if there are no material facts in dispute, then this Court can decide whether a communication is a commercial offer for sale at the

summary-judgment stage. *See Junker v. Med. Components, Inc.*, — F. 4th —, No. 2021-1649, 2022 WL 402132, at *3 (Fed. Cir. Feb. 10, 2022).

Here, arguably, there are no material facts in dispute. The NHK Companies attempt to show that Lear twice placed the invention of the '357 patent "on sale" before October 4, 2005, via Lear's emails, presentations, price quotes, and spreadsheets from 2004 and 2005—these historical documents say what they say. And while the parties' briefs do cite testimony about whether Lear placed the invention of the '357 patent on sale before October 4, 2005, that testimony is all from Lear's witnesses.

That said, because it does not alter the outcome, the Court will assume in the NHK Companies' favor that the documents and deposition transcripts do not speak for themselves. Thus, in analyzing whether a quote (or similar document) amounts to a commercial offer for sale, the Court will decide whether a reasonable jury (as opposed to the Court) could find that the quote amounts to a commercial offer for sale. But, as stated, because the '357 patent is presumptively valid, the NHK Companies must show that Lear put the invention "on sale" by clear and convincing evidence. This in turn means that if the "on sale" question depends on whether a quote (or like document) is a commercial offer, it must be the case that a reasonable jury could be clearly convinced that the quote is a commercial offer for the NHK Companies to use this defense at trial. *See Poly-Am.*, 383 F.3d at 1308 ("[T]he facts supporting the claim that a patent is invalid in view of an on-sale bar must be proved by clear and convincing evidence.").

9

To sum up, this Court will view the evidence in the light most favorable to the NHK Companies, and decide whether, under that view of the evidence, a reasonable jury could find by clear and convincing evidence that Lear made a commercial offer for sale of the Protec Plus before the critical date.

With that, the Court turns to the two alleged commercial offers.

### 2. Alleged Sale to Tachi-S

To understand why the NHK Companies believe that Lear offered to sell Protec Plus devices to Tachi-S or Honda, some factual background is necessary. In presenting the facts, the Court highlights those relating to whether Lear was attempting to secure a patent license (Lear's position) or whether Lear was attempting to sell the Protec Plus device (the NHK Companies' position). The parties take these differing positions because there is Federal Circuit precedent "to the effect that a sale of rights in a patent, as distinct from a sale of the invention itself, . . . does not implicate the on-sale bar," *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1049 (Fed. Cir. 2001).

In the spring of 2005, Lear was in discussions with Tachi-S, a Japanese company that develops automotive seat frames. Tachi-S wanted to secure a deal with Honda to put its seat frames in Honda's Acura or Accord TSX. (*See* ECF No. 257-7, PageID.15399.) And Tachi-S was interested in including Lear's Protec Plus system in the seat frames that it would, in turn, sell to Honda. (*See id.*)

In April 2005, Morihiro Fujiu, a Lear employee, emailed Michael Maddelein, another Lear employee, asking about how a deal with Tachi-S might be structured:

"What do you think about component sales to Tachi-S Japan? Should we rely on their production arrangement in Japan with [a] TLA [technology license agreement] or Lear US production and export them to Japan?" (ECF No. 257-7, PageID.15398.) Maddelein responded, "regarding production in Japan, we would license the design and application to Tachi-S and they would manufacture or outsource as they wish. We would receive a royalty % or a one time licensing fee from Honda, depending on how things progress." (ECF No. 257-7, PageID.15397.)

Later in April 2005, Maddelein again emailed Fujiu, "can you contact Tachi-S and work through how they would like to proceed with development? For example, do they just want to use the license and apply the engineering themselves or would they like Lear to perform the application engineering to apply the ProTec Plus system to the Acura backframe? My suggestion is for Lear to perform the packaging and for Tachi-S to make the prototype parts." (ECF No. 257-7, PageID.15395.) By suggesting that Lear could perform the "application engineering" or "packaging," Maddelein meant that Lear would modify the Protec Plus design to fit within Tachi-S's specific backframe. (See ECF No. 250-20, PageID.14527–14528.)

In May and June 2005, Fujiu updated other Lear employees on the results of his meetings with Tachi-S representatives. After a May meeting, Fujiu emailed Maddelein and others, "[Tachi-S] indicated they would prefer licensing instead of component purchase from Lear." (ECF No. 257-17, PageID.15492.) In June, Fujiu obtained a list of questions from Tachi-S; among them were, "Would Lear propose any terms and conditions to Tachi-S in case of accepting development and

11

manufacturing?," and "What is [the] license cost in case of Tachi's production of [active-headrest-restraint]?" (ECF No. 257-17, PageID.15490.)

After a July meeting with Tachi-S, Fujiu reported to Maddelein and others that Tachi-S had requested a quote for five items: (1) Lear's engineering support during the request-for-quotation stage, (2) Lear's engineering support for the "P2 drawing stage," (3) a sled test of the Protec Plus system incorporated into Tachi-S's backframe, (4) Lear's engineering support for the "D1 stage until [start of production]," and (5) "Cost estimate on Lear's license fee per seat." (ECF No. 257-17, PageID.15487.)

In July 2005, Lear employees discussed how they would prepare a quote responsive to Tachi-S's request. In particular, Maddelein emailed Fujiu (and others) that the engineering costs would be $75 per hour, and that the cost of making a Protec Plus unit would be around $7 per unit with a sale price of $10 per unit. (*See* ECF No. 257-17, PageID.15485–15486.) Although Maddelein's email is a bit cryptic, he apparently believed that Tachi-S could manufacture the Protec Plus in Japan for less than Lear's cost in the United States ($7 per unit), and that Honda would be looking to pay about $10 per unit. Thus, Maddelein suggested that, in terms of a license fee, Lear would want $3 per seat (assuming 45,000 seats per year) and $500,000 in up-front cash. (*See* ECF No. 257-17, PageID.15485–15486.)

On July 15, 2005, Lear prepared the quote for Tachi-S that the NHK Companies argue was a commercial offer for the Protec Plus product. The quote was titled, "Reference Quotation for [2008 Acura/Accord] TSX Active Headrest Development Cost." (ECF No. 257-18, PageID.15495.) The quote included five items

that tracked the five items in Tachi-S's request. (*Id.*) For item one, the engineering support during the request-for-quotation stage, including a bill of materials and component cost, the quote stated, "No Charge." (*Id.*) As for items two and three—the engineering support during the P2 and D1 stages—the quote included a figure that corresponded to the number of engineering hours multiplied by the $75 per hour figure mentioned by Maddelein. For instance, to obtain a "dynamic" safety rating, Lear would supply 630 engineering hours at $75 per hour and require $24,000 for a pair of one-week trips to Japan by the engineers, for a total of $71,250. (ECF No. 257-18, PageID.15496.) As for item four, the sled test, Lear quoted two prices depending on the safety-rating agency. Regarding item five, the license fee, Lear quoted as follows: "$3.00 per seat for 45,000 annual vehicle volume (may reduce from the second program on) [and] $500,000 up front payment before [start of production]." (ECF No. 257-18, PageID.15495.) The quote also included a cost relating to a prototype: "Prototype material for PLuS alone (not the seat): $3500 ea." (ECF No. 257-18, PageID.15498.)

Although a commercial offer, even without acceptance, is enough to trigger the on-sale bar, the Court notes that Tachi-S did not accept this particular quote from Lear. In fact, meetings with Lear, Tachi-S, and Honda continued into the fall of 2005, and in October 2005, Tachi-S made a few counter proposals to Lear, including reducing the royalty from $3 per seat to $2 per seat. (ECF No. 257-22, PageID.15545.) Tachi-S stated that it planned to finalize a technology license agreement with Lear "by end of Nov. after [winning] the seat business [from Honda]." (*Id.*)

It appears that Tachi-S's plans fell into place. In November 2005, just weeks after the critical date for the on-sale bar, Fujiu emailed several other Lear employees: "Great news from Tachi-S!!! . . . Honda told Tachi-S that Tachi-S has been selected to develop seat for [the 2008 TSX] and dropped [Tachi's competitor,] TS Tech." (ECF No. 257-25, PageID.15558.) "Based on the award," Fujiu continued, "Lear Japan is planning to accelerate negotiation with Tachi-S on [the technology license agreement] including license cost, and targeting to close it by the end of Nov. [2005]." (ECF No. 257-25, PageID.15558.)

With that factual background, the Court can turn to the NHK Companies' claim that Lear offered the Protec Plus product to Tachi-S before October 4, 2005. The NHK Companies home in on the July 2005 quote. They stress that Lear's July 2005 quote included a per-seat fee of $3.00 and a quantity, "45,000 annual vehicle volume." (*See* ECF No. 250, PageID.14028.) The NHK Companies also argue that Lear's quote included a bill of materials that was a "breakdown of every single part needed for the ProTec PLuS and a price for each part." (ECF No. 250, PageID.14028; ECF No. 257-16, PageID.15481.) According to the NHK Companies, "Lear was not offering a patent license to Tachi-S to do whatever it wanted. Lear's quote was [for] a 'license' to Tachi-S for *an actual product*, the ProTec PLuS—not a patent license." (ECF No. 250, PageID.14028.)

Having reviewed the record, the Court finds that no reasonable jury (again, assuming in the NHK Companies' favor that it is a jury question) could find—by clear

and convincing evidence—that Lear's July 2005 quote was a commercial offer to sell the Protec Plus product.

First consider the bill of materials that, according to the NHK Companies, had a breakdown of the cost of every component of the Protec Plus. (*See* ECF No. 257-16, PageID.15481.) True, in April 2005, there was some discussion about Lear manufacturing the Protec Plus for Tachi-S. (See ECF No. 257-7, PageID.15397–15398.) And in a June 2005 meeting, Tachi-S asked if Lear would "propose any terms and conditions to Tachi-S in case of accepting development and manufacturing?," which could be interpreted as "[Lear's] development and manufacturing." But in May 2005, "[Tachi-S] indicated they would prefer licensing instead of component purchase from Lear." (ECF No. 257-17, PageID.15492.) And in the same June 2005 meeting, Tachi-S also asked, "What is [the] license cost in case of Tachi's production of [active-headrest-restraint]?" (ECF No. 257-17, PageID.15490.) Further, in July 2005, Maddelein estimated that the cost to build one Protec Plus in the U.S. would be about $7, but he believed that "*Tachi-S* can make it for less *in Japan*." (ECF No. 257-17, PageID.15485 (emphases added).) And when Tachi-S requested a bill of materials with component cost for the request-for-quotation stage, Lear's responsive quote was "No Charge." (ECF No. 257-18, PageID.15495.) Taking all this together, it appears that there was discussion about Lear manufacturing the Protec Plus and selling it to Tachi-S, but that the plan later shifted to Lear providing engineering support to Tachi-S so that Tachi-S could make the Protec Plus in Japan. At a minimum, no

15

reasonable jury could be clearly convinced that the bill of materials meant that Lear offered to manufacture and sell Protec Plus devices to Tachi-S.

As for the NHK Companies' reliance on the fact that the July 2005 quote had a price-per-seat figure ($3.00) and a volume figure (45,000 vehicles per year), those figures appear to be a royalty for a technology license agreement. Several pieces of undisputed evidence support that interpretation. First, the emails show that Tachi-S and Lear repeatedly discussed a technology license agreement, or "TLA." (*See* ECF No. 257-20, PageID.15511; ECF No. 257-22, PageID.15546, 15547; ECF No. 257-25, PageID.15558.) Second, the estimated cost for the parts for the Protec Plus was much more than $3—either $7 by Maddelein's estimate or $18 according to the bill of materials that the NHK Companies rely on. Either way, if Lear only received $3 for each Protec Plus device, Lear would have lost money; it is quite unlikely that Lear would have offered a losing deal to Tachi-S. Third, although the Court acknowledges that Maddelein is an interested witness, Maddelein unequivocally testified that $3-per-seat figure in the quote was for a license of Lear's patents. (ECF No. 250-20, PageID.14555, 14568.) Finally—although neither party attached it to the briefing associated with Lear's summary-judgment motion—in June 2006, Lear and Tachi-S in fact entered into a technology license agreement; under that agreement, Lear allowed Tachi-S to use its proprietary information to make products for Honda in exchange for a $2.50 royalty. (ECF No. 252-2, PageID.14845.) Taking all this together, no reasonable jury would be clearly convinced the $3 and 45,000 figures represented Lear's offer to sell Protec Plus devices to Tachi-S. To the contrary, it

16

appears that Lear offered its proprietary design and testing information about the Protec Plus to Tachi-S in exchange for a royalty of $3 per seat. Whether viewed as a technology license or a patent license, no reasonable jury could find by c;ear and convincing evidence that the on-sale bar is implicated. *See In re Kollar,* 286 F.3d 1326, 1330–31 (Fed. Cir. 2002) (making clear that licensing a patent does not place the patented invention "on sale" within the meaning of § 102(b) and further indicating that neither an offer of "production rights in the invention" nor an offer of "the exclusive right to market the invention" triggers the on-sale bar); *Moleculon Rsch. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267 (Fed. Cir. 1986) (stating that "an assignment or sale of the rights in the invention *and* potential patent rights is not a sale of 'the invention' within the meaning of section 102(b)." (emphasis added)).

As something of an alternative argument, the NHK Companies say that Lear sold Tachi-S a prototype of the Protec Plus and that the sale of even one instance of the invention is enough to trigger the on-sale bar. (ECF No. 250, PageID.14027.)

The problem with this argument is that no reasonable jury could find that the language the NHK Companies cite clearly and convincingly shows that Lear sold a prototype. In its July 2005 quote, Lear offered "Prototype *material* for PLuS alone (not the seat): $3,500." (ECF No. 257-18, PageID.15498 (emphasis added).) Lear interprets this as providing Tachi-S with the "estimated cost of materials for Lear to develop a prototype." (ECF No. 256, PageID.15343.) Perhaps Lear's interpretation is correct; perhaps not. But that is exactly the point: it is far from clear or convincing that Lear offered to sell Tachi-S a prototype of the Protec Plus.

17

In sum, the better view of the evidence is that Lear offered Tachi-S a technology license prior to the critical date for the on-sale bar. And even if the evidence could be construed as Lear offering Tachi-S units of the Protec Plus device before the critical date, this Court is not clearly convinced that was the case and it would not be reasonable for a jury to be clearly convinced that was the case. As such, to the extent that the NHK Companies' on-sale bar defense rests on Lear's transaction with Tachi-S, it fails as a matter of law.

### 3. Alleged Sale to Toyota

That leaves the NHK Companies' claim that Lear sold the Protec Plus to Toyota before the critical date.

In support of this claim, the NHK Companies primarily rely on three pieces of evidence. The first is an email; the email reflects that on September 28, 2004, Gerald Locke, a named inventor on the '357 patent, gave a presentation on the advantages of the Protec Plus to Toyota. (ECF No. 257, PageID.15462; *see also id.* at PageID.15463–15477.) The second piece of evidence is a "Quotation Status" document indicating that in September 2004, Locke provided a quote to Toyota for the "Russia Seats" program. (ECF No. 257-13, PageID.15460.) The third is a document that is titled, "Lear sales scenario table / Active H/R business for Toyota." (ECF No. 257-12, PageID.15458.) In relevant part, the "Sales Scenario" table looks like this:

Lear sales scenario table / Active H/R business for Toyota

| Type of AHR | Price AHR module Vol assumption | Weight Unit per seat Kg | Performance Pass | Target vehicle | Target area | Status | Target Vol K / year | Remark |
|---|---|---|---|---|---|---|---|---|
| ProTecPLus | $6.40 1.5 M | 1,297 | 202a IIHS ENCAP 6 star | Yaris Camry | Euro Russia China ? | Prototype | | |

(ECF No. 247-12, PageID.15458.) According to the NHK Companies, this evidence shows that Lear made an offer to Toyota in September 2004 to sell the Protec Plus for vehicles in Russia. (ECF No. 250, PageID.14023–14024.)

This evidence, even when construed in the NHK Companies' favor, would not clearly convince a reasonable jury that Lear made a commercial offer of the Protec Plus to Toyota in September 2004. Starting with the "Quotation Status" document, there is no document or witness that describes the "Russia Seats" program, let alone that it involved the Protec Plus. The NHK Companies seek to remedy this evidentiary gap with the "Sales Scenario" table and Locke's presentation to Toyota. True, as shown above, the table does suggest that the price for the Protec Plus was $6.40 per unit, that the number of units was 1.5 million, and that one of the target areas was Russia. (ECF No. 247-12, PageID.15458.) But the table is not dated, it is titled "sales scenario" suggesting hypothetical sales, the target area has a question mark, and nothing indicates that Locke was involved in creating the table. As for Locke's presentation on the Protec Plus to Toyota and his "Russia Seats" quote to Toyota, it is true that both were in September 2004. But aside from that timing, nothing connects his presentation to the quote. Further, it would be reasonable for Lear to make a presentation on its new technologies without being in a position to provide a price, quantity, and shipment date—hallmarks of a commercial offer. In fact, although he is not a disinterested witness, Mark Farquhar, an engineering director for Lear, testified that in September 2004, the Protec Plus was not developed enough to be offered for commercial sale. (ECF No. 250-6, PageID.14467–14468.) And this

testimony aligns with a late September 2004 email from Locke to other Lear employees. Although Locke's email stated that the Protec Plus had been tested, he still referred to it as a "prototype." (ECF No. 257-5, PageID.15388.)

In all, while it is possible to infer from the Quotation Status document, the Sales Scenario table, and Locke's presentation that Lear offered the Protec Plus to Toyota in September 2004, "possible" is not the standard of proof. Given the gaps in the evidentiary record and the considerable inferences required to fill them, no reasonable jury would be clearly convinced that Lear made a commercial offer of the Protec Plus device in September 2004 to Toyota.

*  *  *

To summarize, there is evidence that Lear made an offer to Tachi-S in 2005, but that offer appears to have been for a technology license and, at a minimum, no reasonable jury would be clearly convinced that it was an offer for Protec Plus devices. And there is some evidence that Lear made an offer of the Protec Plus device to Toyota in September 2004, but that evidence is not clear and convincing. Lear is entitled to summary judgment on the NHK Companies' on-sale-bar defense to infringement of the '357 patent.

## B. Inequitable Conduct

The NHK Companies assert that several of Lear's patents are unenforceable because Lear engaged in inequitable conduct before the United States Patent and Trademark Office. To better understand Lear's basis for seeking summary judgment on this defense, some explanation of the law is useful.

When prosecuting a patent before the patent office, a patent applicant has a duty to disclose information that bears on whether the application should be rejected or granted. *See Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1109 (Fed. Cir. 2003). For instance, if the patent applicant knows that a prior-art reference (e.g., an earlier patent) discloses key features of its invention, then the applicant must notify the patent office about the prior-art reference during patent prosecution. *See id.* Disclosing relevant prior art aids the patent office in deciding whether the claimed invention is novel or non-obvious, and thus, whether the application should be accepted or rejected.

In raising the defense of inequitable conduct, an accused infringer claims that a patent holder did not fulfill its duty of disclosing material information to the patent office. *See id.* To establish this affirmative defense, the accused infringer must prove two elements by clear and convincing evidence: materiality and intent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). "[T]he materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291. As for the intent element, "the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO." *Id.* at 1290. "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the [prior art] reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* 1290.

21

One more point of law. At the summary-judgment stage, the Court's role is usually limited to deciding whether a reasonable jury could find for the non-movant at trial. Here, though, the Court's role is greater. As the name suggests, the doctrine of inequitable conduct stems from equity. And consistent with equity practice, there is "no right to a jury, and the trial court has the obligation to resolve the underlying facts of materiality and intent." *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1333 (Fed. Cir. 2011); *see also GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1331 (Fed. Cir. 2020); *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1110 (Fed. Cir. 2003). Further, apart from the factual questions of materiality and intent, the ultimate question of whether Lear committed inequitable conduct is left to this Court's discretion. *See Taltech Ltd. v. Esquel Enterprises Ltd.*, 604 F.3d 1324, 1328 (Fed. Cir. 2010) (reviewing ultimate finding for abuse of discretion and reviewing materiality and intent findings for clear error).

That summary of the law tees up the parties' dispute. The NHK Companies argue that Lear committed inequitable conduct when prosecuting four of the five patents-in-suit: the '043, '733, '959, and '357 patents. In Lear's view, the NHK Companies lack evidence supporting any of their claims of inequitable conduct. Thus, Lear asks the Court for summary judgment on these inequitable-conduct defenses. (ECF No. 237, PageID.11230–11240.)

The Court addresses the inequitable-conduct defenses to the '733 patent, the '949 patent, the '357 patent, and '043 patent in that order.

22

### 1. '733 Patent

The NHK Companies argue that when Lear was prosecuting the application for the '733 patent in 2002, Lear failed to disclose a then-existing patent. According to the NHK Companies, a patent issued to James Schubring, when combined with another prior-art reference, makes the invention of the '733 patent obvious. And obvious inventions are not entitled to patents. 35 U.S.C. § 103. So, according to the NHK Companies, Lear's failure to disclose the Schubring reference during prosecution means that Lear engaged in inequitable conduct, and thus, the '733 patent is not enforceable.

Although Lear believes that the Schubring reference was not material to the patent office's decision to grant the '733 patent, it does not seek summary judgment on that basis. (*See* ECF No. 237, PageID.11236–11237.) Instead, Lear focuses on the other prong of inequitable conduct: intent. In particular, Lear asserts that the NHK Companies have not identified any person associated with Lear who, at the time of the '733 patent's prosecution, (1) knew of the Schubring reference, (2) knew that it would be material to the patent office, and (3) decided to not disclose it. (ECF No. 237, PageID.11237.)

In response to Lear, the NHK Companies make a few points. They point out that one of the inventors of the '733 patent, Mladen Humer, was aware that Schubring was also working in the area of headrest restraints and was aware that, in or around 2000, Schubring had helped develop a headrest restraint for a Buick. (ECF No. 250, PageID.14037; ECF No. 257-26, PageID.15596.) The NHK Companies

also point out that when Humer was deposed in 2018, he admitted to having seen the Schubring patent "15 years ago maybe," i.e., around the time that Lear was prosecuting the '733 patent. (ECF No. 250, PageID.14037; ECF No. 257-26, PageID.15598.) The NHK Companies further highlight that when Lear prosecuted two other patents based on Humer's active-headrest-restraint work, Lear did disclose Schubring's patent to the patent office, but when prosecuting the '733 patent, Lear "somehow" did not. (ECF No. 250, PageID.14038.) Indeed, the NHK Companies argue that Schubring was more material to the patentability of the '733 patent than the other two in which it was disclosed. (*Id.*) Finally, the NHK Companies point out that during a proceeding before the Patent Trial and Appeal Board in 2014, NHK Seating of America raised the Schubring reference, and then "Lear immediately disclaimed claim 10 [of the '733 patent]"; this, say the NHK Companies, shows that even Lear recognizes the materiality of Schubring to the '733 patent. (ECF No. 250, PageID.14038.)

These points, even taken collectively, do not establish the intent element by clear and convincing evidence.

As an initial matter, the fact that Lear disclaimed claim 10 of the '733 patent is a red herring. When NHK Seating of America challenged the validity of the '733 patent in front of the Patent Board, it argued that the invention of claim 10 of the '733 patent was not novel based on five prior-art references, only one of which was Schubring. (ECF No. 250-44, PageID.14828.) And when the Board decided to review the novelty of the claimed invention, it agreed to do so based on the other four prior-

art references—not Schubring. *See NHK Seating of Am. v. Lear*, IPR No. 2014-01026, slip op. at 24–25 (Dec. 31, 2014). And only after the Board instituted review, did Lear disclaim claim 10 of the '733 patent. So it does not appear, as the NHK Companies imply, that the Schubring reference is what prompted Lear to disclaim claim 10 of the '733 patent. It follows that Lear's disclaimer was not a concession that Schubring was material to the grant of the '733 patent.

Second, Humer's deposition testimony that he saw the Schubring patent "[q]uite some time ago . . . 15 years ago maybe" lends limited support to the NHK Companies' assertion of inequitable conduct. True, Lear was prosecuting the application for the '733 patent in 2003, which was 15 years before Humer's 2018 deposition. But Humer's testimony is quite equivocal—"*some* time ago" and "15 years ago *maybe*"—and so his testimony is not clear or convincing that he saw Schubring's patent before the '733 patent issued in December 2003.

But even ignoring any issue with timing, there are two more requirements that the NHK Companies must satisfy to establish intent: it must be that Humer "knew that [Schubring's patent] was material" and that he (individually or in consultation with others at Lear) "made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290.

The evidence bearing on these two requirements is mixed. In Lear's favor, Humer testified that when he had been shown the patent 15 (or so) years ago, he "didn't study it" because he had been "preoccupied" with his own work. (ECF No. 257-26, PageID.15598–15599.) Even stronger, in an affidavit, Humer states, "I have never

read the Schubring patent." (ECF No. 256-4, PageID.15369.) In the NHK Companies'
favor, it is odd that someone working in the field of active headrest restraints would
not have studied or at least read a patent in the same field after it was brought to his
attention. Further, Lear did disclose Schubring's patent when pursuing two later
patent applications arising out of Humer's work. So the evidence cuts in both
directions: Humer says he did not read Schubring's patent back when Lear was
pursuing the application for the '733 patent, but the NHK Companies have provided
some reasons to doubt Humer's testimony.

This is where the legal standard does its work. "To meet the clear and
convincing evidence standard, the specific intent to deceive must be the single most
reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at
1290 (internal quotation marks omitted). So "when there are multiple reasonable
inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290–91.
Here, it would be reasonable to infer that in or around 2003, Humer did not examine
the Schubring patent carefully enough to decide whether it was relevant to the '733
patent application. And, as Humer has testified, it is reasonable to infer that
"[d]ecisions as to what prior art references are to be submitted to the U.S. Patent and
Trademark Office during the filing and prosecution of such patent applications are
made by the attorney(s) handling such filing and prosecution, not by [Humer]." (ECF
No. 256-4, PageID.15368.) Indeed, the NHK Companies have pointed to nothing in
the record that affirmatively suggests that while the '733 application was pending,
Humer both concluded that the Schubring was material to patentability and decided

26

to withhold it from the patent office. In short, "there are multiple reasonable inferences that may be drawn" and so the "intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290–91.

In sum, having reviewed the evidence cited by the NHK Companies, this Court cannot say that "it *require*[*s*] a finding of deceitful intent." *Id.* (internal quotation marks omitted). Lear is thus entitled to summary judgment on the NHK Companies' inequitable-conduct defense to the '733 patent.

### 2. '949 Patent

Regarding the '949 patent, the Court will be brief. The NHK Companies' inequitable-conduct arguments for the '949 patent are the same as for the '737 patent. (ECF No. 250, PageID.14037–14038.) Thus, for the reasons just provided, Lear is entitled to summary judgment on the NHK Companies' inequitable-conduct defense to the '949 patent.

### 3. '357 Patent

Turning to the '357 patent, the NHK Companies say that Lear failed to disclose two pieces of information to the patent office during prosecution of the application for that patent: (1) Schubring's patent and (2) the sales of Protec Plus.

But the NHK Companies' inequitable-conduct arguments based on Schubring are the same as those for the '737 and '949 patents. So, for reasons already given, the NHK Companies' claim that Lear did not disclose the Schubring patent during the prosecution of the '357 patent does not establish inequitable conduct.

As for the NHK Companies' claim that Lear needed to disclose to the patent office that it offered to sell the Protec Plus more than one year before filing the '357 patent application, this basis for asserting inequitable conduct was *mostly* addressed above. In Part IIIA, the Court found that the NHK Companies had not shown that Lear commercially offered the Protec Plus device to Tachi-S or Toyota more than one year before applying for the '357 patent. It would seem to follow that there was nothing for Lear to disclose to the patent office.

But in Part IIIA, the Court merely found that the NHK Companies lacked clear and convincing evidence that Lear offered to sell the Protec Plus device more than one year before filing the application for the '357 patent. But the patent office could find evidence about an offer to sell to be material to its decision to grant a patent even if that evidence does not clearly and convincingly establish an offer to sell. Indeed, the clear-and-convincing standard exists because an issued patent is entitled to a presumption of validity; patent applications, of course, are not presumptively valid. So had Lear disclosed its efforts to strike a deal with Tachi-S and Toyota to the patent office, the patent office would have decided whether—more likely than not—those efforts were a commercial offer for sale before the critical date. *See In re Kollar*, 286 F.3d 1326, 1329 (Fed. Cir. 2002).

Even though the patent office would have merely applied a preponderance standard, the clear and convincing standard still works its way back into the equation via the intent element. As noted above, when an inequitable-conduct defense is based on a patent applicant's failure to disclose a prior-art reference, "the accused infringer

28

must prove by clear and convincing evidence that the applicant knew of the reference, *knew that it was material*, and made a deliberate decision to withhold it." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (emphasis added). And "as a general matter, the materiality required to establish inequitable conduct is but-for materiality," meaning that "the [patent office] would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291. Adapting this prior-art test to the on-sale-bar context, the NHK Companies must prove by clear and convincing evidence that someone involved in the prosecution of the '357 patent knew that Lear's efforts to reach a deal with Tachi-S and Toyota were material, i.e., knew that the patent office would reject the '357 patent application if it were informed of Lear's efforts to strike deals with Tachi-S and Toyota.

The NHK Companies have not produced the requisite clear and convincing evidence of knowledge of materiality. If the evidence clearly and convincingly showed that Lear made a commercial offer of Protec Plus devices before the critical date, then there might be good reason to think that someone involved in the prosecution of the '357 patent knew that the offer was material to patentability. But, as explained in Part IIIA, the evidence does not clearly and convincingly show that Lear made a commercial offer of Protec Plus devices before the critical date. And because there is not clear and convincing evidence of a commercial offer (and because NHK offers no additional evidence of knowledge), the Court cannot find that there is clear and convincing evidence that someone knew of a commercial offer. Thus, the NHK Companies lack clear and convincing evidence that anyone involved in the

29

prosecution of the '357 patent knew that the September 2004 or July 2005 quotes were material.

The NHK Companies' make one last argument in support of their inequitable-conduct defense to the '357 patent. In fairly conclusory fashion, they say that they would have more evidence in support of their defense except that they did not learn about Lear's on-sale activities until "long after" they deposed two of the '357 patent's inventors. (ECF No. 250, PageID.14039.) The NHK Companies suggest that at trial, they will be able to elicit testimony from these witnesses in support of their on-sale-bar defense. (*Id.*)

This assertion that "we'll get it at trial" does not forestall summary judgment. The NHK Companies have not given the Court good reason to think that Lear's trial witnesses will offer testimony favorable to them. In fact, as discussed, Maddelein testified that the July 2005 quote was for a patent license and Farquhar testified that the Protec Plus was not sufficiently developed in September 2004 to give a quote to Toyota. If, as the NHK Companies believe, Lear destroyed or intentionally withheld relevant evidence of its on-sale-bar activities (*see* ECF No. 263), the Court might reinstate the NHK Companies' inequitable-conduct defense to the '357 patent.

In sum, the NHK Companies lack clear and convincing evidence that Lear knowingly withheld material information (Schubring or a commercial offer for sale) from the patent office during prosecution of the '357 patent.

#### 4. '043 Patent

The NHK Companies also argue that the '043 patent is unenforceable due to Lear's inequitable conduct. The Court has referred this portion of Lear's Non-Technology Motion for Summary Judgment to Special Master Joseph W. Berenato, III. Accordingly, Lear's efforts to dismiss the inequitable-conduct defense to the '043 patent will not be addressed in this opinion.

### C. Insufficient Evidence

Finally, the Court turns to Lear's assertion that some of the NHK Companies' affirmative defenses based on the written-description requirement, indefiniteness, non-enablement, anticipation and obviousness, and inequitable conduct lack sufficient evidentiary support.

The analysis can be streamlined a bit. In response to Lear's motion, the NHK Companies have agreed to dismiss the anticipation, obviousness, and inequitable-conduct defenses that Lear claims lack evidentiary support. (Notably, these are not all of the NHK Companies' anticipation, obviousness, and inequitable-conduct defenses, but only the specific defenses listed below in the Court's order.) Remaining, then, is Lear's assertion that the NHK Companies' affirmative defenses based on the written-description requirement, non-enablement, and indefiniteness must be dismissed.

Lear makes almost identical arguments for all three of these affirmative defenses. Lear points out that at trial, the NHK Companies have the burden of proving these defenses by clear and convincing evidence. (ECF No. 237,

31

PageID.11221.) Thus, Lear stresses that at summary judgment, it merely has the burden of "point[ing] out" that the NHK Companies lack evidence supporting these defenses. (*Id.*) To this end, Lear says that the NHK Companies have "offer[ed] no expert testimony" on how a person of ordinary skill in the art would understand the patents' written descriptions. (*Id.*) Lear likewise says that the NHK Companies have "offered no expert testimony (or any other evidence)" in support of indefiniteness. (ECF No. 237, PageID.11222.) And Lear makes a similar argument about non-enablement: the NHK Companies have "offered no expert testimony on this issue." (*Id.*)

There are two related problems with Lear's argument.

The first is that Lear cites no case holding that these defenses—inadequate written description, non-enablement, and indefiniteness—fail as a matter of law without expert testimony. True, as Lear points out, all of these defenses involve how a person having ordinary skill in the art would interpret the patent specification or its claims. But none of the cases Lear cites state that expert testimony is the only way for a juror or this Court to understand how an ordinary practitioner would interpret Lear's patents. In fact, in analyzing "indefiniteness, general principles of claim construction apply," *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015), and courts can—but do not have to—consider expert testimony when construing claims, *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1319 (Fed. Cir. 2006). Further, the NHK Companies assert that they can establish these defenses at trial by presenting the patent-prosecution file, cross-

examining the named inventors, and cross-examining Lear's experts. (ECF No. 250, PageID.14017–14018.)

In addition, when there is no cited precedent requiring expert testimony in support of these three affirmative defenses, a conclusory statement that the NHK Companies have "no expert testimony" or "no expert testimony (or any other evidence)" simply does not discharge Lear's initial summary judgment burden.

For instance, the Second Circuit has explained, "[t]he mere assertion by a defendant moving for summary judgment that the plaintiff 'has not produced any evidence' to support an essential element of the plaintiff's claim does not satisfy the burden that Rule 56(a) imposes." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017). The Court continued, "unless the moving defendant cites portions of the record that show its entitlement to judgment, an assertion by the defendant that the plaintiff 'has not produced any evidence,' without more, does not show that the plaintiff has insufficient evidence." *Id.* at 115–16. The oft-cited Wright & Miller treatise is to the same effect: "the party moving for summary judgment cannot sustain its burden . . . merely by asserting that the nonmovant lacks evidence to support its claim . . . . [Instead,] [t]he movant must show . . . why the court should conclude that its opponent lacks sufficient evidence." 10A Mary Kay Kane, Federal Practice and Procedure § 2727.1 (4th ed.). And while the Second Circuit and a treatise are not binding on this court, the Federal Circuit applies the summary-judgment law of the regional circuit, *see e.g., Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1140 (Fed. Cir. 2021), and the Sixth Circuit has explained, "'[A] party

seeking summary judgment always bears the initial responsibility of . . . identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact,'" *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 505 (6th Cir. 2006) (quoting *Celotex*, 477 U.S. at 323)). Thus, binding precedent dictates that "a moving party must point out specifically why the nonmoving party fails to present a genuine issue of material fact as to the nonmoving party's case." *Id.*

In short, Lear has made bare statements that the NHK Companies "offer[ed] no expert testimony" or "offered no expert testimony (or any other evidence)" and cited no legal authority requiring expert testimony to support defenses based on the written-description, enablement, and definiteness requirements. Thus, Lear has not discharged its initial summary-judgment burden on these defenses.

## IV. Order

For the reasons given, Lear's Motion for Summary Judgment on Non-Technology Issues (ECF No. 237) is GRANTED IN PART and DENIED IN PART. Lear is entitled to summary judgment on the NHK Companies' on-sale-bar defense to infringement of the '357 patent. Lear is entitled to summary judgment on the NHK Companies' inequitable-conduct defenses to infringement of the '733, '959, and '357 patents. (Lear's request for summary judgment on the NHK Companies' inequitable-conduct defense to the '043 patent will be addressed by Special Master Berenato, at least in the first instance.)

Per the NHK Companies' agreement, the following defenses are also dismissed: "(1) asserted claims of the '043 patent were anticipated by Mertens, or obvious in view of Mertens and the BMW and Toyota seatbacks; (2) asserted claims of the '357 patent were anticipated by Omori, Nakano '708, 2004 SAAB 9-3 seatbacks, and 1999 SAAB 9-5 seatbacks; and (3) inequitable conduct concerning the '043 patent based on an Abu-Isa et al. reference." (ECF No. 250, PageID.14019.)

Lear's motion is otherwise denied.

SO ORDERED.

Dated: March 23, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE