UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAR CORPORATION,

      Plaintiff,

v.

NHK SEATING OF AMERICA INC.,
NHK SPRING COMPANY, LIMITED,
and
NHK INTERNATIONAL INC.,

      Defendants.

Case No. 13-12937
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES FOR PATENT NO. 5,378,043 [233] AND DENYING DEFENDANTS' MOTION TO AMEND [253] AND DENYING PLAINTIFF'S MOTION TO FILE SUR-REPLY [259]**

---

Lear Corporation holds a series of patents on active-headrest-restraint technology. The patented technology reduces whiplash during a vehicle crash by moving the headrest to minimize the impact. Lear believes that various NHK corporate entities have made or sold products that infringe some of its active-headrest-restraint patents. So Lear filed this patent-infringement lawsuit against, initially, NHK Seating of America and, later, NHK Spring Company and NHK International ("the NHK Companies").

This nine-year-old case has finally reached the summary-judgment stage. Both sides seek summary judgment on various claims or defenses. This opinion addresses a single patent: U.S. Patent No. 5,378,043. Even more specifically, this opinion

addresses the NHK Companies' claim that even if their products infringed the '043 patent, it owes Lear no damages for that infringement. The NHK Companies say they are entitled to summary judgment on damages owed for any infringement of the '043 patent because Lear failed to comply with the patent-notice requirements of 35 U.S.C. § 287 and because they are entitled to intervening rights under 35 U.S.C. § 252.

For the reasons explained below, the Court will largely deny the NHK Companies' motion.

## I. Background

## A. Facts

Because the legal issues raised by the parties are not based on a single, cohesive set of facts, the Court will largely present the facts as it addresses the legal issues. But to set the stage, the Court presents some basic information about the NHK Companies and Lear's efforts to notify them of patent infringement.

NHK Spring Company was founded in 1939. (ECF No. 47-40, PageID.981.) As of today, it has close to 22,000 employees. *See Corporate Profile*, NHK Spring Co., https://perma.cc/4RYE-JDFN. According to the company's website, its business areas include automotive suspension springs, precision springs and components, and automotive seats. *Id.* Because NHK Spring Company is located in Japan, and because it is the shorthand the parties use, the Court will refer to NHK Spring Company as "NHK Japan."

NHK International was founded in 1976. (ECF No. 47-40, PageID.981.) It is a subsidiary of NHK Japan. (ECF No. 254-2, PageID.15257.) The company is located in

Michigan and describes itself as the "North American headquarters" for NHK Japan. (ECF No. 47-14, PageID.799.) NHK International provides engineering, testing, and sales support to several NHK manufacturing facilities in the United States. (*See id.*) These manufacturing facilities include the third defendant in this case, NHK Seating of America. (ECF No. 47-14, PageID.801.)

Before it was called NHK Seating of America, the company was a joint venture of the plaintiff and the defendant in this case. In particular, prior to 2006, Lear and NHK Japan had jointly owned General Seating of America. (ECF No. 232-6, PageID.9844.) NHK Japan purchased all of Lear's shares in 2006 and renamed the company to NHK Seating of America. (*See* ECF No. 48-2, PageID.990.) NHK Seating of America, like NHK International, is a subsidiary of NHK Japan. (ECF No. 254-4, PageID.15265.) Because of its name and its location in Indiana, the Court will refer to NHK Seating of America as "NHK America."

As part of their initial joint venture, Lear had granted a limited patent license to NHK Japan and General Seating of America. (ECF No. 233-12, PageID.10282.) Apparently, the license granted NHK Japan and General Seating the right to make products for Subaru and Isuzu even if those products infringed U.S. Patent No. 5,378,043 ('043 patent). (*See* ECF No. 233-12, PageID.10282; ECF No. 233-13, PageID.10284–10285.) The '043 patent claims an active headrest restraint that functions like a see-saw: when the driver's upper back is pressed against the seatback during a collision, the headrest pivots forward to reduce whiplash. *See* U.S. Patent No. 5,378,043 figs. 3, 4 (filed Jun. 1, 1993).

Not long after NHK Japan became the sole owner of NHK America in 2006, Lear sent NHK Japan two letters relating to the license agreement and the '043 patent. In a July 2006 letter, Lear "remind[ed]" NHK Japan that the license was limited to products made for Subaru and Isuzu, noted that it had recently learned that NHK Japan might be developing an active headrest restraint for Toyota, and asked NHK Japan "if the design is covered by any of the licensed patents." (ECF No. 233-12, PageID.10282.) NHK Japan wrote back explaining that it was developing an active headrest restraint for Toyota but that the product differed from the claims of the '043 patent. (*See* ECF No. 233-13, PageID.10284–10285.) In August 2006, Lear responded, essentially stating that it was not convinced by NHK Japan's attempt to distinguish its product from the patent. (*See* ECF No. 233-14, PageID.10287–10288.) Soon, NHK Japan's legal counsel, Sughrue Mion, became involved. (ECF No. 233-15, PageID.10290.) The letter exchange continued for years, but the focus of the letters shifted from the '043 patent to the potential infringement of other patents Lear held. (*See* ECF No. 233-18, PageID.10296; ECF No. 233-19, PageID.10327.) In 2010, Lear stopped sending NHK Japan letters relating to possible patent infringement.

Meanwhile, NHK Japan continued to work with Toyota. Prior to 2007 or 2008, NHK Japan made or assembled the active headrest restraints for Toyota in Japan. (ECF No. 258-10, PageID.15927.) But in 2007, Toyota requested production in the United States. (ECF No. 258-10, PageID.15924; ECF No. 258-11, PageID.15946; ECF No. 258-13, PageID.15953.) So starting in 2007 or 2008, NHK Japan had its subsidiary, NHK America, produce the active headrest restraints for Toyota. (ECF

No. 258-13, PageID.15953.) Even though production shifted to NHK America, NHK Japan retained control over the design of the active headrest restraints and would even staff some of its engineers at NHK America to help oversee the work. (ECF No. 258-15, PageID.15996–15999; ECF No. 258-16, PageID.16016–16017, 16023–16024, 16034–16035.)

In 2013, Lear filed this patent-infringement lawsuit.

### B. Procedural History

The following is a very brief history of a very long case. Lear initially filed this lawsuit against NHK America but not NHK Japan or NHK International. (ECF No. 1.) The case was stayed for a few years to allow completion of proceedings before the Patent Trial and Appeal Board. (*See* ECF No. 30, 35.) In September 2017, Lear filed a motion to amend its complaint to add claims against NHK Japan and NHK International. (ECF No. 47.) In February 2018, and before the Court had ruled on the motion to amend, Lear filed a separate lawsuit against NHK Japan and NHK International. In that case, NHK Japan and NHK International sought summary judgment on the basis of equitable estoppel; essentially, they argued that when Lear stopped sending letters in 2010, they reasonably thought that it was safe to continue manufacturing active headrest restraints and so it would be inequitable to now permit Lear to sue. *See Lear Corp. v. NHK Spring Co., LTD*, No. 18-10613, 2019 WL 934811, at *1 (E.D. Mich. Feb. 26, 2019). The Court denied the summary judgment motion, and not long thereafter, Lear's case against NHK Japan and NHK

International was consolidated with Lear's case against NHK America (i.e., this case). (ECF No. 140.)

After multiple extensions of the discovery period, this case has now reached the *final* summary-judgment stage. (NHK America previously moved for summary judgment of non-infringement and NHK Japan and NHK International previously moved for summary judgment based on equitable estoppel.) Three summary-judgment motions are now pending before this Court. (ECF Nos. 233, 237, 238.) A separate opinion entered today addresses Lear's motion for summary judgment on issues that are not based on the technology of the patents-in-suit. Lear's other motion for summary judgment, which is based on the technology of the patents-in-suit, has been referred to Special Master Joseph W. Berenato, III. This opinion addresses the NHK Companies' motion for summary judgment on damages owed for any infringement of the '043 patent. (ECF No. 233.) This opinion also addresses two related motions: Lear's motion to file a sur-reply (ECF No. 259) and the NHK Companies' motion to amend their answers to plead intervening rights (ECF No. 253).

## II. Decisional Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

## III. Analysis

Roughly, the parties' arguments are as follows. The NHK Companies argue that because Lear failed to provide notice of the '043 patent in the manner set out in

35 U.S.C. § 287, Lear cannot collect damages from them even if they infringed the '043 patent. (*See* ECF No. 233, PageID.10194.) Lear counters by arguing that it provided § 287 notice to NHK Japan via the letters it sent between 2006 and 2010. (*See* ECF No. 258-1, PageID.15792–15796.) And Lear argues that for three different reasons, it also provided § 287 notice to NHK America and NHK International. Separately, the NHK Companies argue they are entitled to intervening rights under 35 U.S.C. § 252. (ECF No. 233, PageID.10212.) Lear counters that intervening rights is an affirmative defense that the NHK Companies forfeited by not pleading it in their answers. (ECF No. 258-1, PageID.15804.)

The Court's analysis proceeds in three steps. First, the Court will address whether Lear provided § 287 notice to NHK Japan. Next, the Court will address whether Lear provided § 287 notice to the other two defendants, NHK America and NHK International. Finally, the Court will address intervening rights, including Lear's claim that the defense is forfeited.

## A. Notice to NHK Japan

Under the Patent Act, a patent holder has a duty to notify the public of its patent. In particular, under 35 U.S.C. § 287(a), a patent holder is to mark its products embodying a patented invention with the word "patent" or "pat." followed by the patent's number (e.g., "patent 5,378,043"). "In the event of failure so to mark," § 287(a) continues, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter." In other words, if the patent holder does not mark

its product, then it may only collect damages from an accused infringer from the point it provides actual notice of infringement to the accused infringer.

Here, the parties agree that Lear did not mark its active-headrest-restraint products with "Patent 5,378,043" or the like (ECF No. 258-1, PageID.15782), and so the parties' dispute centers on whether Lear provided the NHK Companies with actual notice as required by § 287(a). It is Lear's burden to establish actual notice, *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996), and the question is one for the jury, *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001). So the task for this Court is to decide whether a reasonable jury could find that Lear provided the NHK Companies with actual notice as required by § 287(a).

To complete that task, it is necessary to review in greater detail the letters that Lear and NHK Japan exchanged between 2006 and 2010.

In July 2006, Lear sent NHK Japan a letter noting that Lear was aware that NHK Japan might be developing an active headrest restraint for Toyota, "remind[ing]" NHK Japan about the limited scope of its license agreement with Lear, and asking NHK Japan whether "the design is covered by any of the licensed patents or requires use of technical information furnished by Lear." (ECF No. 233-12, PageID.10282.)

Later that month, NHK Japan responded. "It is true that NHK has developed a new seat active head restraint for Toyota vehicles, however, it is clear that this new mechanism has nothing [to do] with either LEAR patents or technical information." (ECF No. 233-13, PageID.10284.) NHK Japan's letter went on to describe differences

8

between its product and the claims of Lear's '043 patent. (ECF No. 233-13, PageID.10285.) As one example, NHK Japan explained that its headrest "slidably" attached to the seatback frame whereas the claims of the '043 patent involved a headrest "pivotally" attached with the seatback frame. (*Id.*) NHK Japan further asserted, "There are many d[i]fferences between the Lear patent independent claims and [our] Toyota [product]. Therefore[,] the active head restraint designed for Toyota does not inf[r]inge the Lear Patent." (*Id.*)

The next month, August 2006, Lear responded to NHK Japan. Lear's letter indicated that even though NHK Japan's product slidably attached to the seatback frame, it could still fall within the scope of the '043 patent: "a headrest slidably supported by a seatback frame may also be pivotally attached with the seatback frame." (ECF No. 233-14, PageID.10288.) And in addressing another difference that NHK Japan had identified, Lear stated, "Neither this feature nor any of the other features identified in your letter preclude the design from being covered by the '043 patent." (*Id.*) Lear informed NHK Japan, "the information you provided is not sufficient for us to make a determination as to whether the NHK design is covered by the '043 patent." (*Id.*) Lear "welcome[d]" the chance to meet with NHK Japan to review its design "in more detail." (*Id.*)

In November 2006, Sughrue Mion, a law firm representing NHK Japan, intervened. In a letter to Lear, the firm wrote, "We represent NHK [Japan] in connection with intellectual property matters. Please send all future correspondence concerning this matter directly to us." (ECF No. 233-15, PageID.10290.) Sughrue

further noted, "NHK has forwarded to us your letters of July 31, and November 7, 2006 for response." (ECF No. 233-15, PageID.10290.)

Just over a year after its initial letter, on August 8, 2007, Lear again wrote to NHK Japan (via Sughrue Mion). The title of Lear's letter was simply a list of four patent numbers, including the '043 patent. (ECF No. 233-16, PageID.10292.) "We recently had the opportunity to review a head restraint system that we understand was provided by NHK for use on a Toyota Highlander vehicle seat," Lear wrote. (*Id.*) Lear continued, "We wish to bring several Lear patents to your attention as they may be relevant to future marketing plans of NHK. Those patents include U.S. Patent Nos. 6,655,733; 6,631,955; 6,631,949 and 5,378,043 (copies of which are enclosed)." (*Id.*) Lear's August 2007 letter concluded, "We have been able to reach agreements with other companies that were in similar situations, and we are hopeful that we can do the same with NHK." (*Id.*)

In response to Lear's August 2007 letter, NHK Japan (through Sughrue) wrote, "If Lear is alleging that any of the subject patents are infringed by NHK's head restraint design, then we request a detailed claim chart for each patent claim alleged to be infringed." (ECF No. 233-17, PageID.10294.) The "subject patents" referred to the list of four patents, including the '043 patent. (*See id.*)

Over the course of the next three years, Lear's counsel and NHK Japan's counsel continued to exchange letters, debating whether NHK Japan's product infringed Lear's patents. But the focus of these letters was not the '043 patent. For instance, while the title of Lear's December 2007 letter still listed the same four

patent numbers, including the '043 patent, the content of the letter focused on Lear's '949 patent; indeed, Lear provided a claim chart for the '949 patent. (ECF No. 233-18, PageID.10296–10300.) As another example, Lear's April 2008 letter again focused on its '949 patent. (ECF No. 233-19, PageID.10304.) And Lear's January 2009 letter was similar—it provided further argument as to why NHK Japan's product infringed the '949 patent. (ECF No. 233-19, PageID.10313.)

In June 2010, Lear sent NHK Japan a final letter regarding NHK Japan's alleged infringement. Lear continued to argue infringement of the '949 patent, but also included claim charts for three other patents. (ECF No. 233-19, PageID.10326–10327.) But Lear never provided a claim chart for the '043 patent.

Those facts help the Court decide whether a reasonable jury could find actual notice under § 287, but some law helps as well. In particular, three cases—one relied on by the NHK Companies and two relied on by Lear—help answer the key question.

The NHK Companies rely on *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178 (Fed. Cir. 1994). There, Amsted sent out a letter to many companies, including Buckeye Steel, letting them know that Amsted had recently been assigned a patent, that, like the prior patent holder, it would actively seek to enforce, and that they should "acquaint" themselves with the patent "and refrain from supplying . . . parts which would infringe" the patent. *Id.* at 185. The Federal Circuit found that Amsted's letter-to-the-industry did not give Buckeye actual notice as required by § 287. In so holding, the Court stated, "Actual notice requires the affirmative

11

communication of a specific charge of infringement by a specific accused product or device." *Id.* at 187.

Although "a specific charge of infringement by a specific accused product" sounds favorable to the NHK Companies, two cases cited by Lear show that the Federal Circuit has softened its stance since *Amsted*. In *SRI International, Inc. v. Advanced Technology Laboratories, Inc.*, SRI, the patent holder, wrote a letter to ATL, the accused infringer. 127 F.3d 1462, 1469–70 (Fed. Cir. 1997). SRI's letter identified a specific ATL product, stated that the product "may" infringe SRI's patent, included a copy of the patent, and stated that "SRI would be pleased to provide [ATL] with a nonexclusive license under the patent." *See id.* The Federal Circuit affirmed the district court's determination that SRI's letter met the actual-notice standard of § 287. In so doing, the Federal Circuit clarified that it is "not controlling whether the patentee threatens suit, demands cessation of infringement, or offers a license under the patent." *Id.* at 1470. "[T]he actual notice requirement of § 287(a) is satisfied," the Court continued, "when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *Id.* at 1464.

Also consider *Gart v. Logitech, Inc.*, 254 F.3d 1334 (Fed. Cir. 2001). There, Samuel Gart's letter to Logitech made specific reference to claims 7 and 8 of his patent, referenced Logitech's Trackman Vista product, and "noted that Logitech may wish to have its patent counsel examine the patent to determine whether a non-exclusive license under the patent is needed." *Id.* at 346 (internal quotation marks,

alterations, and ellipses omitted). At the summary-judgment stage, the district court found that Gart's letter did not meet the actual-notice requirement of § 287. *Id.* at 1336–37. The Federal Circuit reversed, stating, "in *SRI* we explained that as long as the communication from the patentee provides sufficient specificity regarding its belief that the recipient may be an infringer, the statutory requirement of actual notice is met." *Id* at 1346. "Thus," the Court continued, "the requirement of 'a specific charge of infringement' set forth in *Amsted* does not mean the patentee must make an 'unqualified charge of infringement.'" *Id.*

When read in the light most favorable to Lear, a reasonable jury could find that Lear's August 8, 2007 letter is more similar to the letters in *SRI* and *Gart* than the one in *Amsted*. In that letter, Lear stated that it had recently "review[ed] a head restraint system that we understand was provided by NHK for use on a Toyota Highlander vehicle seat" and that it "wish[ed] to bring several Lear patents to your attention." (ECF No. 233, PageID.10292.) The "several Lear patents" included the '043 patent. (*See id.*) A reasonable jury could find that those statements both "informed" NHK Japan "of the identity of the patent" (the '043 patent) and "the activity that is believed to be an infringement" (the head restraint system for the Toyota Highlander). This is further bolstered by the August 2006 letter. There, Lear told NHK Japan that NHK Japan's attempt to distinguish its product and the '043 patent was not convincing. Indeed, Lear expressly stated that the distinctions did not "preclude the [NHK Japan] design from being covered by the '043 patent." (ECF No. 233-14, PageID.10288.) Taking the August 2006 letter in the light most favorable to

Lear, a reasonable jury could find that by telling NHK Japan that its distinctions did not preclude infringement, Lear conveyed to NHK Japan that its product may infringe. And "may" is enough. *See* 127 F.3d at 1470 ("[T]he purpose of the actual notice requirement is met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice *may* be an infringer." (emphasis added)).

As for the third requirement for § 287 notice—"a proposal to abate the infringement, whether by license or otherwise," *SRI*, 127 F.3d at 1464—the August 8, 2007 letter states, "We have been able to reach agreements with other companies that were in similar situations, and we are hopeful that we can do the same with NHK." While that proposal to abate is short of asking NHK Japan to take a license, it is similar to Gart's statement that "Logitech may wish to have its patent counsel examine the patent to determine whether a non-exclusive license under the patent is needed." 254 F.3d at 1345. Thus, reading the August 2007 letter in the light most favorable to Lear, a reasonable jury could find that the letter provided NHK Japan with actual notice under § 287.

In all then, reading Lear's August 2006 and August 2007 letters in the light most favorable to Lear, a reasonable jury could find that Lear gave NHK Japan the actual notice required by § 287(a).

The NHK Companies make a few arguments that attempt to counter this conclusion, but none justify summary judgment in their favor.

14

For one, the NHK Companies point out that in Lear's August 2006 letter—the one where Lear expressed that it was not convinced by NHK Japan's distinctions—Lear admitted that it needed more information. In particular, Lear wrote, "the information you provided is not sufficient for us to make a determination as to whether the NHK design is covered by U.S. Patent No. 5,378,043." (ECF No. 233-14, PageID.10288.) Homing in on this statement, the NHK Companies argue, "Lear didn't know whether it was alleging infringement." (ECF No. 254, PageID.15243; *see also* ECF No. 233, PageID.10207.) In other words, the NHK Companies argue that if Lear lacked information to decide whether NHK Japan's product infringed the '043 patent, then how could Lear allege infringement as required by § 287?

The problem with this argument is that Lear did not have to give NHK Japan a definitive thumbs up or down on infringement—it only had to express its belief that NHK Japan "may" be an infringer. *SRI*, 127 F.3d at 1470. Based on Lear's statements that it was not convinced by the distinctions that NHK Japan had identified, a reasonable jury could find that Lear expressed its belief that NHK Japan's product "may" infringe even though it lacked information to make that claim definitively.

Skipping ahead a year, the NHK Companies also point out that by the time Lear sent the August 2007 letter, Lear had reviewed NHK Japan's product and thus "had everything it needed to determine whether the NHK Design was covered by the '043 patent." (ECF No. 233, PageID.10208.) "Yet," argue the NHK Companies, "Lear still did not allege infringement." (*Id.*) But, again, Lear did not have to definitively

15

allege infringement—it merely had to express its belief that NHK Japan's product may be infringing the '043 patent. *See SRI*, 127 F.3d at 1470.

Finally, the NHK Companies point out that in responding to Lear's August 2007 letter, NHK Japan's counsel wrote, "If Lear is alleging that any of the subject patents are infringed by NHK's head restraint design, then we request a detailed claim chart for each patent claim alleged to be infringed." (ECF No. 233-17, PageID.10294.) And, in response, Lear never provided a claim chart for the '043 patent. In fact, after the August 2007 letter, the parties' focus shifted to the '949 patent and still later, two other patents. The upshot, in the NHK Companies' view, is that Lear either never alleged infringement of the '043 patent (because it never provided a claim chart as demanded) or, at least, abandoned any claim of infringement of that patent.

The Court tends to agree with the NHK Companies that the '043 patent seemed to fall by the wayside after Lear's August 2007 letter. The later letters focused on other patents, and Lear never did provide a claim chart for the '043 patent as demanded by NHK Japan, though it provided charts for other patents. But the NHK Companies' response to Lear's August 2007 letter itself shows that one possible interpretation of that letter was that Lear was raising infringement of the '043 patent. And, as stated, a reasonable jury could find that the August 8, 2007 letter provided actual notice. So Lear did not need to again provide § 287 notice after the August 2007 letter. And the Court is not persuaded that Lear's later failure to provide a claim chart retracted the notice it previously provided.

\* \* \*

In sum, a reasonable jury could find that Lear's August 2007 letter, or at least the August 2007 and August 2006 letters together, provided NHK Japan with actual notice under § 287(a).

### B. Notice to NHK America and NHK International

But what about the other two defendants in this case, NHK America and NHK International? After all, Lear's August 2006 and August 2007 letters were sent to NHK Japan.

Even so, Lear maintains that NHK America and NHK International received actual notice under § 287(a) in at least one of three ways. For one, Lear argues that NHK America and NHK International were alter egos of NHK Japan and, because the three companies were really one, when it gave notice to NHK Japan, it gave notice to NHK America and NHK International. (*See* ECF No. 258-1, PageID.15799.) For another, Lear points out that two NHK Japan officers who were "cc'd" on the letters it sent to NHK Japan also served on NHK America's and NHK International's board of directors. (ECF No. 258-1, PageID.15797.) And says Lear, by at least 2007, NHK America had retained the same legal counsel as NHK Japan. (ECF No. 258-1, PageID.15786.) So Lear argues, between the two board members and counsel, NHK America and NHK International received § 287 notice. Third, Lear says that the two people who were "cc'd" on the letters, by virtue of their positions on NHK America's board and NHK International's board, were agents that NHK America and NHK

17

International had authorized to receive notice of patent infringement. (ECF No. 258-1, PageID.15803.)

The Court assesses these three theories for how Lear might have given NHK America and NHK International § 287 notice in turn.

### 1. Notice via Alter Ego Relationship

Lear argues that both NHK America and NHK International are alter egos of NHK Japan, and thus, the § 287 notice it gave to NHK Japan was also § 287 notice to NHK America and NHK International.

Although the question of whether two companies are alter egos is very fact intensive, the parties also dispute the law. Lear believes Michigan alter-ego law governs. (*See* ECF No. 258-1, PageID.15800; ECF No. 259, PageID.16187.) That makes some sense: Lear is a Michigan plaintiff, it filed suit in a court located in Michigan, and NHK International is located in Michigan. On the other hand, it seems a bit odd that Michigan law would govern whether NHK America and NHK International are alter egos of a Japanese company. Further, this case has no state-law claims, and instead is premised solely on federal law. Indeed, the reason for answering the alter-ego question is to answer the patent-law question of actual notice. Thus, it also makes some sense, as the NHK Companies argue, that federal alter-ego law governs. (*See* ECF No. 254, PageID.15248; ECF No. 262, PageID.16217.)

In addition to this choice-of-law dispute, there is question over who—judge or jury—ultimately answers the alter-ego question. On the one hand, whether two companies are one and the same is a highly fact-intensive inquiry. *See e.g., Herman*

*v. Mobile Homes Corp.*, 317 Mich. 233, 243 (1947). And juries are well suited to find facts. On the other hand, ignoring corporate formalities has equitable roots. *See Dep't of Consumer Indus. Servs. v. Shah*, 600 N.W.2d 406, 411 (Mich. Ct. App. 1999) ("Equity has the power to look through and behind the legal entity of corporate existence." (internal quotation marks omitted)). And doctrines rooted in equity are usually for a judge, not a jury. *See Tamko Roofing Prod., Inc. v. Smith Eng'g Co.*, 450 F.3d 822, 828 (8th Cir. 2006) ("Under California law, it is well-settled that the alter ego doctrine is essentially an equitable one . . . . Thus, as the district court properly recognized, the jury sat in an advisory capacity only." (internal quotation marks and alteration omitted)); *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 738 (7th Cir. 2004) ("[A]lthough the doctrine of piercing the corporate veil under Illinois law involves important findings of fact, it is still . . . essentially an equitable doctrine and therefore is not amenable to determination by a jury." (internal quotation marks omitted)). Thus, at the summary-judgment stage, is it proper to ask the usual question of what a reasonable jury could find?

As it turns out, the Court need not resolve the choice-of-law dispute or answer the who-decides question. Instead, the Court will assume in Lear's favor that Michigan law supplies the alter-ego test. And the Court will further assume in Lear's favor that the entire alter-ego question is one for the jury, meaning that to survive summary judgment, Lear only has to show that a reasonable jury could find that NHK America and NHK International are alter egos of NHK Japan. The Court can

make these two assumptions because, even with the benefit of them, Lear's assertion that the NHK Companies are one and the same does not survive summary judgment.

Under Michigan law, a subsidiary company is deemed the alter ego of its parent company only if, among other things, the subsidiary is a "mere instrumentality" of the parent. *See Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 761 (Mich. 1947); *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007) (applying Michigan law). In deciding whether a subsidiary is a "mere instrumentality" of its parent, Michigan courts consider a host of factors. *United Ins. Grp. Agency, Inc. v. Patterson*, No. 299631, 2011 WL 5067251, at *2 (Mich. Ct. App. Oct. 25, 2011) (listing ten factors); *Glenn v. TPI Petroleum, Inc.*, 854 N.W.2d 509, 520 (Mich. Ct. App. 2014) (listing six factors). These factors include whether the parent and subsidiary "share board members or executives," whether "the parent directed the policies and decisions of the subsidiary," and whether "the parent considered the subsidiary's project to be its own." *See United Ins. Grp.*, 2011 WL 5067251, at *2.

To start the analysis, Lear has some evidence suggesting that NHK America and NHK International are arms of NHK Japan. Prior to 2007 or 2008, NHK Japan had been producing active-headrest-restraints for Toyota in Japan. (ECF No. 258-10, PageID.15927.) But when Toyota wanted restraints to be produced in the United States, NHK Japan directed NHK America to produce the active headrest restraints that it had been producing. (ECF No. 258-13, PageID.15953; ECF No. 258-14, PageID.15977–15978; ECF No. 258-10, PageID.15924, 15934.) As for NHK

International, it is the self-described "North American headquarters" for NHK Japan. (ECF No. 47-14, PageID.799.) According to NHK International's website, it "functions as the corporate, sales, and R&D headquarters providing advanced engineering solutions, product design, testing and sales support to all of NHK's North American manufacturing facilities," which includes NHK America. (ECF No. 47-14, PageID.799.) Thus, in the case of NHK America, it took over a project that NHK Japan had been performing, and in the case of NHK International, it serves as the North American headquarters for NHK Japan. *See United Ins. Grp.*, 2011 WL 5067251, at *2 (providing that parent and subsidiary are more likely alter egos "if the parent directed the policies and decisions of the subsidiary[] and if the parent considered the subsidiary's project to be its own").

Lear also has evidence that NHK Japan controlled significant aspects of NHK America's active-headrest-restraint production even after some or all of the production moved from Japan to the United States. Taking the evidence in the light most favorable to Lear, NHK Japan designed the active headrest restraint, and NHK America needed NHK Japan's approval to make any changes to that design. (*See* ECF No. 258-7, PageID.15896–15897; ECF No. 258-16, PageID.16023–16024, 16033; ECF No. 258-18, PageID.16050.) Indeed, NHK Japan engineers did years-long stints as engineering managers at NHK America; these managers served as liaisons between the two companies at least with respect to active-headrest-restraint design. (ECF No. 258-15, PageID.15996–15999; ECF No. 258-16, PageID.16016–16017, 16023–16024, 16034–16035.) NHK Japan also supplied NHK America with the machines necessary

21

to assemble and test the active headrest restraints. (ECF No. 233-33, PageID.10437; ECF No. 258-14, PageID.15982; ECF No. 258-15, PageID.15995.)

And in addition to the NHK Japan engineers who worked at NHK America as managers, Lear has produced evidence of other NHK Japan and NHK International officers or employees working at NHK America. *See United Ins. Grp.*, 2011 WL 5067251, at *2 (providing that parent and subsidiary are more likely alter egos "if they share board members or executives"). From the time that NHK Japan acquired NHK America through the time of this lawsuit, typically three NHK Japan officers served on NHK America's five-person board of directors. (ECF No. 258-23, PageID.16120; *see also* ECF No. 258-8, PageID.15899.) (In fact, when NHK Japan acquired NHK America, it hand-picked all of NHK America's board. (See ECF No. 48-2, PageID.990–991.)) And during that same time period, one or two NHK Japan officers served on NHK International's board of directors. (*See id.*) Further, NHK America's president is an NHK International employee—NHK America merely "lease[s]" him from NHK International. (*See* ECF No. 258-10, PageID.15941.) Additionally, NHK America no longer employs its own sales group. (ECF No. 258-10, PageID.15922; ECF No. 254-11, PageID.15315.) Instead, NHK International employees handle NHK America's sales. (*See id.*)

Finally, Lear highlights financial ties among NHK Japan, NHK America, and NHK International. For one, NHK America reports its financial data to both NHK Japan and NHK International. (*See* ECF No. 258-10, PageID.15935–15936; ECF No. 258-1, PageID.15789.) NHK International also handles all commodity pricing for

NHK America. (ECF No. 254-11, PageID.15315.) And NHK International "files a consolidated tax return for all of its subsidiaries, including [NHK America]." (ECF No. 254-4, PageID.15266.) Further, NHK Japan has regularly loaned NHK America money, with the loan amounts totaling tens-of-millions of dollars. (*See* ECF No. 254-3, PageID.15263; ECF No. 254-4, PageID.15266.)

Thus, taken in isolation, Lear's evidence of shared projects, employees, directors, and finances might permit a reasonable jury to find that NHK America or NHK International is a "mere instrumentality" of NHK Japan. But Lear's evidence does not stand alone. And once the NHK Companies' undisputed evidence is factored into the equation, no reasonable jury could deem the subsidiaries a "mere instrumentality" of their parent.

As an initial matter, Lear has not rebutted the NHK Companies' evidence that only a small percentage of NHK America's overall workforce are NHK Japan or NHK International employees. In particular, it is not disputed that NHK Japan's managers at NHK America only make up about 20 percent of NHK America's managers. (ECF No. 254-11, PageID.15314.) Nor is it disputed that NHK International employees (e.g., the salespeople) only make up about one percent of NHK America's workers. (*Id.*) As for the fact that NHK Japan officers served on NHK America's and NHK International's board of directors, "courts have recognized that . . . common directors and officers, alone, will not provide a sufficient basis for disregarding the fiction of these corporations' separate existence." *Maki v. Copper Range Co.*, 328 N.W.2d 430, 433 (Mich. Ct. App. 1982). Thus, while NHK Japan, NHK America, and NHK

23

International have some shared officers and employees, when a more complete picture is painted, that overlap does little to show that the two companies are alter egos.

As for Lear's evidence that NHK Japan exercised significant control over NHK America's production of active headrest restraints for Toyota, that appears to be an incomplete picture of NHK America's overall production. Lear has offered no evidence that NHK America's only product—or even a majority of NHK America's work—was producing active headrest restraints for Toyota. In fact, historical versions of NHK America's website show that it produced other products besides active headrest restraints for Toyota. *See* NHK Seating Product Line, https://perma.cc/MX26-5N9W?type=image (Feb. 9, 2007) (indicating that products were seat assemblies for several Subaru models and the Toyota Camry as well as Tonneau (trunk) covers for the Subaru Legacy); NHK Seating Product Line, https://perma.cc/LC6B-AL2S?type=image (Jan. 14, 2013) (indicating that products included seat assemblies for several Subaru models and the Toyota Camry as well as the active headrest restraint for Toyota).

Finally, a more complete picture of the financial arrangements between NHK Japan, NHK America, and NHK International strongly suggests that the companies are not alter egos. No assets are commingled among the NHK Companies. (ECF No. 254-3, PageID.15262.) Indeed, both NHK America and NHK International keep their own revenue (as opposed to funneling their profits to NHK Japan). (ECF No. 254-2, PageID.15258; ECF No. 254-3, PageID.15263.) And while Lear is correct to point out

24

that NHK America and NHK International have borrowed money from NHK Japan, NHK America and NHK International also pay back their loans with interest. (ECF No. 254-3, PageID.15263.) And, according to them, the interest rate is only slightly lower than the rate banks would charge. (*See id.*) Further, each of the NHK Companies keep their own financial records. (ECF No. 254-2, PageID.15257 (NHK International); ECF No. 254-3, PageID.15262 (NHK Japan); ECF No. 254-4, PageID.15265 (NHK America).) Finally, Lear has cited no evidence that either NHK America or NHK International are undercapitalized. Thus, several alter-ego factors favor the NHK Companies. *See United Ins. Grp.*, 2011 WL 5067251, at *2 (providing that parent and subsidiary are more likely alter egos "if all of the parent's revenue comes from the subsidiary's sales, if all capital for the subsidiary is provided by the parent, . . . if the subsidiary is seriously undercapitalized, [and] if the parent regularly provided gratuitous services to the subsidiary").

To sum up, piercing the corporate veil is the exception, not the rule. *See Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995) ("Michigan law presumes that, absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities."). While there is some understandable overlap in operations and management among NHK Japan, NHK America, and NHK International, the evidence of record shows that the three companies have a great deal of independence, including financial independence. In this Court's view, no reasonable jury could find that NHK America and NHK International were "a sham or mere agent or instrumentality of [NHK Japan's] will." *Green v. Ziegelman*, 873

N.W.2d 794, 807 (Mich. Ct. App. 2015). It follows that even if Lear provided § 287 notice to NHK Japan, that was not also notice to NHK America and NHK International under the theory that three companies were one and the same.

## 2. Notice via Board Members and Counsel

Lear also argues that NHK America and NHK International received actual notice as required by § 287 because two board members and legal counsel received copies of the letters about the '043 patent. In particular, Lear points out that Masahiko Kimura and Kazumi Tamamura were "cc'd" on the July and August 2006 letters to NHK Japan about the license and '043 patent. Although Kimura was an officer of NHK Japan at that time, he was also a member of NHK America's board and NHK International's board. (ECF No. 258-1, PageID.15788; ECF No. 258-8, PageID.15899.) Tamamura was also an NHK Japan officer and an NHK America board member. (*Id.*) Apart from Kimura and Tamamura, Lear claims that NHK America admitted that its counsel, Sughrue Mion, received a copy of the August 2007 letter. (*See* ECF No. 258-1, PageID.15786.) So, says Lear, it gave NHK America and NHK International § 287 notice via Kimura, Tamamura, and Sughrue Mion.

Lear's reliance on Kimura and Tamamura is misplaced.

Legally speaking, Lear cites no authority for the notion that a patent holder can provide a company § 287 notice by sending letters asserting infringement to one or two of the company's board members. Lear does cite *In re Nord Resources Corporation Securities Litigation*, but the court there merely found that a longtime board member could be liable as a "controlling person" under the securities laws—

the case has nothing to do with patent law or § 287. *See* No. C-3-90-380, 1992 WL 1258516, at *3 (S.D. Ohio Dec. 16, 1992). Lear also cites *Korrey v. Ferguson*; there the court found that when a company's employee is responsible for a particular corporate task, then the information that the employee learns while completing that task is treated as the corporation's knowledge. *See* No. 1:10-CV-755, 2012 WL 13019004, at *2 (W.D. Mich. Sept. 4, 2012). Not only is *Korrey*'s rule rooted in Michigan law and not federal patent law, but under *Korrey*'s test, it must also be the case that the employee was "authorized and charged" with the corporate task. *Id.* Yet, Lear has not shown that either Kimura or Tamamura was "authorized and charged" with handling claims of patent infringement or that it was even their responsibility to notify those who were responsible for handling claims of patent infringement. Indeed, it was Hirofumi Takase—then the director of NHK Japan's intellectual-property department—who responded to Lear's July 2006 letter and to whom Lear addressed its August 2006 letter. (ECF No. 233-13, PageID.10284; ECF No. 233-14, PageID.10287.)

Lear also relies on *Hockerson-Halberstadt, Inc. v. JSP Footwear, Inc.*, a case that did involve § 287. There, the patent holder, Hockerson-Halberstadt, believed that shoes bearing the FUBU trademark infringed its patent and so it sent a patent-infringement letter to the president of FUBU, Daymond Aurum. 104 F. App'x 721, 723 (Fed. Cir. 2004). Aurum was also the CEO of another company, GTFM, and, unknown to Hockerson, GTFM had licensed the FUBU trademark to a third company, JSP. *Id.* In time, Hockerson sued JSP (and others). It was not disputed that

27

Hockerson had not marked its products with the patent number, and so JSP defended on the ground that it did not receive actual notice under § 287. *See id.* at 724. The Federal Circuit found that the letter sent to Aurum sufficed to give actual notice to JSP. Not only was Aurum an agent of GTFM (he was the company's CEO after all), but Hockerson "had no knowledge of JSP" when it sent the letter to Aurum, and it was reasonable for Hockerson to believe that GTFM made the alleged infringing shoes. *Id.* at 724–25. Indeed, the license agreement between GTFM and JSP was "confidential" and "[Hockerson] could not have discerned the relationship between JSP and GTFM from any publicly available documents." *Id.* at 725.

This case is not like *Hockerson-Halberstadt*. Although Lear might have reasonably thought NHK Japan was the infringer (just like Hockerson thought FUBU was), Lear has not shown that anything prevented it from uncovering NHK America's or NHK International's involvement in producing or selling the allegedly infringing active headrest restraints. In *Hockerson-Halberstadt*, the Federal Circuit was concerned that if Hockerson's letter to the perceived infringer did not satisfy § 287's notice requirement, then companies would have "a perverse incentive" of using "several layers of corporate disguise" to avoid notice. *See id.* at 725. Lear has not shown that NHK Japan attempted to use several layers of corporate disguise. Further, in *Hockerson-Halberstadt*, the patent-infringement letter was sent to the CEO of GTFM. And a CEO would certainly know that his company had licensed the FUBU mark to another company, i.e., Aurum almost certainly knew that if anyone

28

was infringing, it was JSP. Here, Lear has not shown that Kimura or Tamamura knew that the true infringer was NHK America or NHK International.

And apart from not citing on-point legal authority, the facts do not support a finding that NHK America or NHK International received § 287 notice because Kimura and Tamamura served on NHK America's board or NHK International's board. Recall that under *SRI*, "the actual notice requirement of § 287(a) is satisfied[] when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, *accompanied by a proposal to abate the infringement, whether by license or otherwise*." 127 F.3d at 1464 (emphasis added). As explained above, Lear's proposal to abate came via its August 2007 letter. Yet, by then, all letters were being funneled through NHK Japan's counsel, and nothing indicates that Kimura or Tamamura received the August 2007 letter. (*See* ECF No. 233-15, PageID.10290; ECF No. 233-16, PageID.10292 (letter to counsel and cc to Takase, NHK Japan's director of intellectual property).) In other words, Lear has not even shown that Kimura and Tamamura received actual notice as defined in *SRI*, let alone that notice to them could be notice to NHK America or NHK International.

In all, no reasonable jury could find that Lear provided NHK America or NHK International actual notice under § 287 because it copied Kimura and Tamamura on letters about the '043 patent.

But what about Lear's assertion that it provided NHK America actual notice via the company's counsel, Sughrue Mion? At first blush, it seems that this theory is a non-starter. NHK America offers sworn testimony that it did not retain Sughrue

Mion until after Lear filed this lawsuit (in 2013) and that before this suit, NHK America had never spoken to Sughrue Mion. (ECF No. 254-11, PageID.15314.) Unrebutted, that testimony would doom Lear's theory that NHK America received the notice required by § 287 via the letters it sent between 2006 and 2010.

But that testimony does not stand unrebutted; in fact, a reasonable jury could find that it is rebutted by another NHK America statement. NHK America answered one of Lear's interrogatories as follows: "NHK [America] became aware of U.S. Patent Nos. 6,655,733, 6,631,955, and 6,631,949 by correspondence from Lear to NHK [America's] counsel dated August 8, 2007." (ECF No. 258-5, PageID.15873.) As explained above, a reasonable jury could find that the August 8, 2007 letter provided NHK Japan actual notice under § 287. And NHK America's interrogatory answer suggests that it too received the August 8, 2007 letter.

True, that answer could be interpreted as merely stating that—at some point in time—NHK America learned of the three patents by reading a letter *dated* August 8, 2007. But context would permit a jury to interpret NHK America's interrogatory answer differently. Consider the specific question posed to NHK America: "Separately for each of the Asserted Patents, describe in detail the circumstances under which You [NHK America] *first became aware* of each of the Asserted Patents, *including the date* and the persons involved." (ECF No. 258-5, PageID.15872 (emphases added).) Because Lear specifically asked for the date that NHK America first learned of the asserted patents, a reasonable jury could think that not only did NHK America learn of the three patents by reading a letter dated August 8, 2007, it learned of them

30

sometime shortly after that letter was sent. Otherwise, NHK America's interrogatory answer is not responsive to the question.

This interpretation of NHK America's interrogatory response is also supported by NHK Japan's response to an identical interrogatory. Like NHK America, NHK Japan answered: "NHK Japan became aware of U.S. Patent Nos. 6,655,733 and 6,631,949 by correspondence from Lear to NHK Japan's counsel dated August 8, 2007." (ECF No. 258-4, PageID.15833.) And it is not disputed that NHK Japan's counsel read the August 8, 2007 letter shortly after it was sent. Yet NHK America's answer is the same as NHK Japan's. So it is fair to think that NHK America's counsel read the August 8, 2007 letter shortly after it was sent.

In sum, NHK America's interrogatory answer would permit a reasonable jury to find that NHK America received copies of the August 2006 and August 2007 letters from Sughrue Mion not long after those letters were sent. Accordingly, a reasonable jury could find that NHK America, just like NHK Japan, received actual notice as required by § 287. But no reasonable jury could find that Lear's letters to Tamamura, Kimura, and Sughrue Mion gave NHK International § 287 notice.

### 3. Notice via Authorized Agents

Lear also seeks to establish that it provided NHK America and NHK International actual notice under § 287 because Tamamura and Kimura (who were "cc'd" on the July and August 2006 letters) were agents of NHK America and NHK International who were authorized to receive notices of patent infringement. (ECF No. 258-1, PageID.15803.) In support of this argument, Lear cites *In re Elonex Phase*

*II Power Management Litigation*, No. C.A. 01-082 GMS, 2002 WL 433614 (D. Del. Mar. 20, 2002). The court in that case stated, "[n]otice to an agent with authority to receive notices of infringement may be sufficient under Section 287(a)." *Id.* at *3.

Lear's notice-via-agents theory is not persuasive. *Elonex Phase* states that under an agency theory, "the plaintiff bears the burden of proving the agent's authority to accept such notice on behalf of the alleged infringer." 2002 WL 433614, at *3. Yet Lear cites no case finding that a board member, simply by being a board member, is an agent authorized to accept notice of patent infringement. Lear does cite *In re Newpower*, but all that case says is that a board member is an agent of the company—not that she is an agent authorized to receive notice of patent infringement. *See* 229 B.R. 691, 706 (W.D. Mich. 1999). Lear also cites *Crow v. Ocwen Loan Servicing., LLC*, Nos. 08-31798, 13-3012, 2013 Bankr. LEXIS 3623, at *9 (Bankr. N.D. Ohio Aug. 30, 2013), but that case merely found that "for purposes of [Bankruptcy] Rule 7004(b)(3)" a board member is presumed to be an agent authorized to accept service of process.

Because Lear lacks evidence that Kimura and Tamamura were agents authorized to accept § 287(a) notice, its notice-via-agents theory fails as a matter of law.

\* \* \*

A brief summary is in order. A reasonable jury could find that NHK America received actual notice under § 287 because its counsel received copies of Lear's August 2006 and August 2007 letters. But a reasonable jury could not find that NHK America

received actual notice because it is an alter ego of NHK Japan or because Kimura and Tamamura were copied on Lear's letters. As for NHK International, none of Lear's three theories would permit a jury to find that it received notice under § 287.

## C. Intervening Rights

Apart from asserting that Lear cannot collect damages for infringement of the '043 patent because it did not provide notice under 35 U.S.C. § 287, the NHK Companies separately argue that Lear's ability to recover for infringement of the '043 patent is limited by their intervening rights.

To appreciate this argument, a bit of law is useful. Even years after a patent has issued, the patent office can reassess whether the claimed invention deserved patent protection; this process is known as patent reexamination. *See* 35 U.S.C. § 302. After emerging from reexamination, if a claim of the reexamined patent is "substantially identical" to a claim of the original patent, then that claim is treated as though it were part of the original patent. *See* 35 U.S.C. § 252 ¶ 1. But what about a claim that is not substantially identical to an original claim? Enter intervening rights. Oversimplifying, intervening rights under paragraph 2 of § 252 permit an accused infringer to sell off existing inventory that infringes claims of the reexamined patent (so long as the claim is not substantially identical to an original claim) and, in some cases, to continue making and selling products that infringe a claim of the reexamined patent. *See BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1220 (Fed. Cir. 1993).

The NHK Companies assert intervening rights as a defense to Lear's claims that they infringed the '043 patent. The '043 patent underwent reexamination that was completed on December 11, 2012. *See* Ex Parte Reexamination Certificate No. 5,378,043 C1 (Dec. 11, 2012). The NHK Companies assert that, as of that date, NHK Japan and NHK America had already manufactured active headrest restraints and thus, under absolute intervening rights, they were allowed to sell or import their existing inventory without infringing the reexamined '043 patent. (*See* ECF No. 233, PageID.10212–10215.) And apart from absolute intervening rights, the NHK Companies argue that before the '043's reexamination certificate issued, they had invested tens-of-millions of dollars into making active headrest restraints, and so, under equitable intervening rights, they could continue making and selling additional active headrest restraints even after December 11, 2012. (ECF No. 233, PageID.10218–10220.) (Notably, the '043 patent expired on June 1, 2013, and so the NHK Companies indicate that their intervening rights defenses relate to only five-and-half months of damages. (*See* ECF No. 253, PageID.15152.))

In responding to the NHK Companies' request for summary judgment on the basis of intervening rights, Lear has elected a collateral rather than a direct attack. Instead of arguing that the NHK Companies cannot establish intervening rights, Lear argues that the NHK Companies should not have the opportunity to establish intervening rights. Lear points out that the defense of intervening rights appears in none of the NHK Companies' answers to the complaint. And says Lear, that omission

precludes the NHK Companies from pursuing absolute or equitable intervening rights in this litigation.

Thus, the issue now before the Court is not the merits of the NHK Companies' intervening rights defense. Instead, the Court must decide (1) whether, generally, the defense of intervening rights is forfeited if not pled in an answer to a complaint, and (2) if so, whether, in this particular case, the NHK Companies should be able to pursue the defense despite not pleading it in their answers.

### 1. Forfeited If Not Pled?

Taking the first question first, the Court finds that, as a general matter, a defendant must plead intervening rights in its answer to preserve the defense.

To start, intervening rights under 35 U.S.C. § 252 is an affirmative defense. The Federal Circuit has at least twice described it as such. *John Bean Techs. Corp. v. Morris & Assocs., Inc.*, 988 F.3d 1334, 1337 (Fed. Cir. 2021) (describing intervening rights as an "affirmative defense"); *Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1388 (Fed. Cir. 1983) (same), *other aspects overruled by In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007).

And if intervening rights is an affirmative defense, then it would seem to directly follow that Federal Rule of Civil Procedure 8 requires its inclusion in the first responsive pleading to the complaint. Under that rule of procedure, a defendant "must affirmatively state any . . . affirmative defense" in responding to the complaint. Fed. R. Civ. P. 8(c); *see also Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004) ("A

response to a pleading must set forth any matter constituting an affirmative defense.").

True, intervening rights relates to damages, and so it would not be an issue until after liability was found. But courts have found that other affirmative defenses relating to damages are subject to Rule 8(c)'s pleading requirement. *See Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1286 (11th Cir. 2000) ("Kirby argues that only defenses which relieve liability must be affirmatively pled and not defenses that diminish damages. . . . Like our sister circuit, we reject Kirby's arguments."); *Sayre v. Musicland Grp., a Subsidiary of Am. Can Co.*, 850 F.2d 350, 355 (8th Cir. 1988). And the NHK Companies have not really developed this argument. The most they do is cite *BIC Leisure Products, Inc. v. Windsurfing International, Inc.*, where the Federal Circuit stated, "BIC's absolute intervening rights defense addresses a damages issue—the identification of those sales of BIC sailboards that properly serve as a measure of Windsurfing's damages. Thus, the absolute intervening rights defense did not become an issue until Windsurfing secured a liability judgment against BIC." 1 F.3d 1214, 1221 (Fed. Cir. 1993). But in *BIC*, the district court had bifurcated trial on liability and damages. As the district court explained with respect to another defendant in the same case, "AMF properly waited to assert this defense until the damage phase of this bifurcated action, because the effect of the defense, if established, will be to reduce the amount of damages which AMF must pay." *BIC*, 1 F.3d at 1221 (quoting *Windsurfing Int'l, Inc. v. Ostermann*, 655 F. Supp. 408, 410 (S.D.N.Y. 1987)). This Court has not bifurcated liability and damages.

In short, the Court finds that Rule 8(c) applies to the affirmative defense of intervening rights and thus, by not pleading the defense in their answers, the NHK Companies are subject to Rule 8(c)'s general waiver rule (or, to be more accurate, forfeiture rule). *See Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004) ("Failure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense.").

## 2. Can Intervening Rights be Pled Now?

Of course, an unpled affirmative defense does not always result in the defense being forfeited. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993). For instance, when a plaintiff receives timely notice of the affirmative defense from someplace other than the answer, courts permit the defendant to pursue the unpled defense. *See id.*

Here, the NHK Companies argue that Lear had fair notice of their unpled defense and that Lear would not suffer prejudice if they pursued it now. (*See* ECF No. 254, PageID.15245–15246.) But the NHK Companies go further than merely arguing that Rule 8(c)'s forfeiture rule is an ill fit for this case. In particular, the NHK Companies have filed a motion to amend their answers to now plead intervening rights. (*See* ECF No. 253.)

In responding to the NHK Companies' Rule 15 motion, Lear directs this Court's attention to Rule 16. (ECF No. 260, PageID.16198–16199.) According to Lear, because the NHK Companies' request to amend comes after the deadline for amending pleadings as set by this Court's scheduling order, the NHK Companies must establish

good cause for amending the scheduling order under Rule 16. (*See id.*) Only then, says Lear, should this Court evaluate the Rule 15 factors for leave to amend. (*See id.*)

Lear's position has support in the law but lacks support in the facts. The case law does say that "[o]nce the [amendment-of-pleadings] deadline passed, the district court could allow Plaintiffs to file their second amended complaint only if the scheduling order was modified." *Leary v. Daeschner*, 349 F.3d 888, 907 (6th Cir. 2003). And under Rule 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." But the particular scheduling order in this case never expressly set a deadline for the amendment of pleadings. (*See* ECF No. 43.) So, arguably, there is nothing in the scheduling order that requires modification.

The Court thus turns to Rule 15. In deciding whether to grant leave to amend under Rule 15, courts consider, among other factors, whether the party opposing the amendment would be prejudiced by the amendment. *See Siegner v. Twp. of Salem*, 654 F. App'x 223, 228 (6th Cir. 2016) (listing factors).

Here, Lear says it would be plenty prejudiced if the NHK Companies were now able to raise intervening rights. For instance, relying on a declaration of Ryutaro Yamazaki, the NHK Companies argue that at the time the '043 patent completed reexamination, "certain [active-headrest-restraint] products . . . were in the supply chain or in inventory, but not yet imported into the U.S." (ECF No. 233, PageID.10213.) Lear says, "[a]t this stage, Lear can no longer seek discovery about these 'certain AHR products,' 'the supply chain,' the 'inventory,' . . . or 'ship[ments] to a U.S. port.'" (ECF No. 258-1, PageID.15807.) The NHK Companies also rely on the

declaration of Richard Reck in support of their intervening rights defense. Lear says that it "no longer has any discovery means to test the veracity of [Reck's] assertions." (ECF No. 258-1, PageID.15807.) And regarding equitable intervening rights, Lear points out that it cannot conduct discovery to test the NHK Companies' claim that it spent tens-of-millions of dollars by the time the '043 patent completed reexamination. (ECF No. 258-1, PageID.15808.)

The NHK Companies say Lear "greatly exaggerates" its prejudice. (ECF No. 261, PageID.16210.) For one, the NHK Companies argue that although they did not plead intervening rights in their answers, they asserted prosecution history estoppel and equitable estoppel from the get-go. (*See* ECF No. 253, PageID.15151.) According to the NHK Companies, these two defenses depend "on most of the same operative facts" as an intervening-rights defense. (ECF No. 253, PageID.15151.) For instance, the amount the NHK Companies invested into producing active headrest restraints is relevant to both economic prejudice for equitable estoppel and "substantial preparation" for equitable intervening rights. (*See* ECF No. 253, PageID.15153.) So, according to the NHK Companies, Lear did (or should have) gathered evidence relating to equitable intervening rights when it gathered evidence relating to equitable estoppel. And regarding the supply chain, the NHK Companies point out that Lear did (or should have) conducted discovery as to how many active headrest restraints the NHK Companies made before the '043 patent expired, but due to the supply-chain process, were not imported into the U.S. until after that patent's expiration. (ECF No. 253, PageID.15153–15154.) In their view, this discovery was

necessary for Lear to accurately prove its damages. And, they say, this same discovery relates to the amount of inventory it would be entitled to sell off under an absolute intervening rights defense. (*See id.*)

The parties have put the Court in a bit of a tough spot: one side says that it would need to conduct discovery if the other were allowed to pursue a defense, while the other side says that the discovery should have already been conducted due to other issues in this case. Further, the parties effectively ask the Court to imagine a hypothetical world where the NHK Companies pled intervening rights in their answers. Would Lear have conducted the same discovery in that hypothetical world as it did in this real-world case? Hard to say.

In other situations, the Court might have to wrestle with these thorny issues. But here, as noted, the NHK Companies' motion to amend comes very late in the game. At the time that the NHK Companies sought to amend, this case was over eight years old. Discovery was closed. (ECF No. 211.) And the dispositive-motion cutoff had come and gone, too. (ECF No. 221, 224.) Not only that, the NHK Companies have clearly spent time thinking about affirmative defenses in this case. There is no shortage of them in the answers, including equitable estoppel, inequitable conduct, and invalidity on a host of grounds (non-enablement, inadequate written description, anticipation, and obviousness). But for whatever reason, they did not raise intervening rights until this case entered the fourth quarter. On these facts, the Court finds Lear's assertion of prejudice sufficient to deny amendment. *See Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 934 (6th Cir. 2020) ("The longer the period

of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice."); *Siegner v. Twp. of Salem*, 654 F. App'x 223, 228 (6th Cir. 2016) ("Allowing an amendment after discovery is closed and summary judgment motions are 'fully briefed' imposes significant prejudice on defendants.").

Apart from arguing that Lear did (or should have) conducted discovery on intervening rights when conducting discovery on other issues, the NHK Companies make a few other arguments worth addressing.

For one, the NHK Companies indicate that they are willing to permit Lear to conduct additional discovery relating to intervening rights. (ECF No. 253, PageID.15154.) True, in some cases, this cures prejudice from a late amendment. But the discovery period in this case was extended at least nine times and lasted for four years. (*See* ECF Nos. 43, 62, 76, 108, 155, 163, 165, 174, 191, 211.) At some point, the parties have had enough discovery. In this Court's opinion, that point is now.

The NHK Companies also argue that because reexamination of the '043 patent completed in December 2012 and the patent expired in June 2013, Lear's prejudice from an intervening rights defense is the loss of only five-and-half months of damages. (ECF No. 253, PageID.15151–15152.) But if that is true, the NHK Companies inability to assert intervening rights only subjects them to an additional five-and-half months of damages. So this argument does not sway the Court either way.

Finally, the NHK Companies stress that when they sought leave to file their most recent summary-judgment motion, they indicated that they would assert

intervening rights. (ECF No. 253, PageID.15147–15148.) And this Court granted the NHK Companies leave. So, say the NHK Companies, "[t]his Court already granted Defendants permission to argue intervening rights." (ECF No. 261, PageID.16208.)

But, candidly, the Court was not aware that the NHK Companies' answers did not plead intervening rights. And the motion for leave did not so indicate. When opposing the NHK Companies' request to file another summary-judgment motion, Lear also did not mention that the affirmative defense was not pled. It was not until Lear filed its summary-judgment response brief that it raised the omission. And the NHK Companies did not seek leave to amend their answer until after Lear filed its summary-judgment response brief. So, apparently, at the time that the NHK Companies sought leave to file a successive summary-judgment motion, no one was thinking about whether the defense of intervening rights had been pled.

In short, granting leave to amend is committed to this Court's discretion, *United States v. Gibson*, 424 F. App'x 461, 464–65 (6th Cir. 2011), and given the procedural posture of this nearly nine-year-old case, the NHK Companies' motion will be denied.

## IV. Order

For the reasons given, the NHK Companies' motion for summary judgment for no damages liability for the '043 patent (ECF No. 233) is GRANTED IN PART and DENIED IN PART. It is GRANTED to the extent that, as a matter of law, Lear did not give § 287 notice to NHK International. The motion is DENIED to the extent that NHK Japan and NHK America assert that, as a matter of law, Lear did not give them

§ 287 notice. The motion is also DENIED to the extent that the NHK Companies claim intervening rights.

Further, the NHK Companies' motion to amend their answers to plead the defense of intervening rights (ECF No. 253) is DENIED.

And because the Court has assumed in Lear's favor that Michigan law governs the alter-ego inquiry, Lear's motion to file a sur-reply that argues for Michigan law (ECF No. 259) is DENIED as moot.

SO ORDERED.

Dated: March 23, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

43